UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | | |
|---|---|---|
| FRANCIS GIMBEL, JR., Derivatively on Behalf of AMAZON.COM, INC., | ) ) ) | Civil Action No. |
| Plaintiff, | ) ) | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT |
| v. | ) ) ) | |
| JEFFREY P. BEZOS, ANDREW R. JASSY, BRIAN T. OLSAVSKY, DAVID H. CLARK, SHELLEY L. REYNOLDS, ADAM N. SELIPSKY, DAVID ZAPOLSKY, KEITH B. ALEXANDER, EDITH W. COOPER, JAMIE S. GORELICK, DANIEL P. HUTTENLOCHER, JUDITH A. MCGRATH, INDRA K. NOOYI, JONATHAN J. RUBINSTEIN, PATRICIA Q. STONESIFER, WENDELL P. WEEKS, TOM A. ALBERG, ROSALIND BREWER, THOMAS O. RYDER, and NATE SUTTON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| AMAZON.COM, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | DEMAND FOR JURY TRIAL |

Plaintiff Francis Gimbel, Jr. ("Plaintiff"), by and through undersigned counsel, submits this Verified Stockholder Derivative Complaint for breach of fiduciary duties, corporate waste, and unjust enrichment.  Plaintiff alleges the following based on personal knowledge, and as to all other matters outside Plaintiff's personal knowledge, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of court filings in (a) the related securities class action lawsuit filed against Amazon.com, Inc. ("Amazon" or the "Company") and certain of its executive officers captioned *Joyce v. Amazon, Inc. et al.*, No. 2:22-cv-617 (W.D. Wash.) (the "Securities Class Action"); (b) consumer class action lawsuits alleging violations of, *inter alia*, the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), and other state privacy laws (collectively, the "Consumer Class Actions");[1] and (c) *District of Columbia v. Amazon.com, Inc.*, No. 2021 CA 001775 (D.C. Sup. Ct.), and *In re Amazon.com, Inc. eBook Antitrust Litigation*, No. 1:21-cv-351-GHW-DCF (collectively, the "Antitrust Actions"); and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts

---

[1] Specifically, the Consumer Class Actions include: *Cooper v. Amazon.com Inc. et al.*, No. 1:21CV04633 (N.D. Ill.); *Ragsdale v. Amazon Web Services, Inc.*, No. 1:20CV00560 (N.D. Ill.); *Redd v. Amazon.com, Inc. et al.*, No. 1:20CV06485 (N.D. Ill.); *Hryniewicki v. Amazon Web Services, Inc.*, No. 1:19CV07569 (N.D. Ill.); *Hogan v. Amazon.com Inc.*, No. 2:21CV00905 (W.D. Wash.); *McGoveran v. Amazon Web Services, Inc. et al.*, No. 3:20CV00031 (S.D. Ill.); *Vance v. Amazon.com, Inc.*, No. 2:20CV1084 (W.D. Wash.); *Flores v. Amazon.com Inc. et al.*, No. 2:21CV00873 (W.D. Wash.); *Flores v. Amazon.com Inc. et al.*, No. 1:21CV04064 (N.D. Ill.); *Wilcosky v. Amazon.Com, Inc. et al.*, No. 1:19CV05061 (N.D. Ill.); *Mayhall v. Amazon Web Services Inc. et al.*, No. 2:21CV01473 (W.D. Wash.); *Reid v. Amazon.com Inc. et al.*, No. 1:21CV06010 (N.D. Ill.); *Schaeffer v. Amazon, Inc. et al.*, No. 3:21CV01080 (S.D. Ill.); *McGoveran v. Amazon Web Services, Inc. et al.*, No. 1:20CV01399 (D. Del.); *Svoboda v. Amazon.com Inc. et al.*, No. 1:21CV05336 (N.D. Ill.); and *Dorian v. Amazon Web Services, Inc.*, No. 2:22-cv-00269 (W.D. Wash.).

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 2

and slides, and other information available in the public domain.

I.     **INTRODUCTION**[2]

1.      This is a stockholder derivative action brought on behalf of and for the benefit of Amazon, against certain of its current and former officers and directors (the "Individual Defendants," defined herein), seeking to remedy their breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, which have caused substantial economic and reputational harm to the Company.

2.      Amazon is a leading multinational technology company, specializing in e-commerce, cloud-based servicing, streaming and artificial intelligence.  According to its public filings, Amazon "seek[s] to be Earth's most customer-centric company."  Amazon was founded in 1994 and is headquartered in Seattle, Washington.  Its common stock trades on the NASDAQ under the ticker symbol "AMZN."

3.      Throughout the relevant period, the Individual Defendants breached their fiduciary duties owed to the Company by knowingly and/or recklessly causing the Company to store the biometric information of its employees, users, and its cloud-based clients' users, including minors, without informing them of these practices and without securing users' written consent, and to fail to develop a written policy available to the public that set a retention schedule and guidelines for users to permanently destroy biometric identifiers when the initial purpose for collection was satisfied in direct violation of BIPA and other states' privacy laws.

4.      The Individual Defendants further breached their fiduciary duties and violated the law by causing the Company to engage in various anticompetitive practices against third party sellers ("TPSs"), including (i) causing the online retailer to enter into contracts with TPSs that had

---

[2] All emphasis herein is added unless otherwise stated.

the effect of inflating prices for consumers through policies that guaranteed Amazon a minimum profit on each item sold, while simultaneously discouraging TPSs from offering their products at lower prices through other retailers; and (ii) giving Amazon private-label products preference over those of its competitors using TPSs's non-public data.

5.      Finally, the Individual Defendants also misled the investing public in the Company's SEC filings and other public statements regarding Amazon's business and compliance with applicable laws and regulations, as detailed further below.

6.      As a result of their misconduct and unbeknownst to the investing public, the Individual Defendants exposed Amazon to heightened risks of increased regulatory scrutiny, government investigations and enforcement actions, and legal exposure otherwise, and Amazon's revenues were, at least in part, the product of impermissible and illegal conduct, and were thus unsustainable at all relevant times.

7.      In addition, as a result of the Individual Defendants' breaches of fiduciary duties detailed herein, the Company has suffered significant damages, including being named as a defendant in the Securities Class Action, Consumer Class Actions, and Antitrust Actions, as well as becoming the subject of a criminal investigation ("Criminal Investigation") by the U.S. Department of Justice ("DOJ") and a government probe into Amazon's public disclosures regarding its business practices by the SEC ("SEC Probe"), and the Company continues to be subjected to mounting damages by failing to redress the harms complained of herein.

8.      The Individual Defendants face a substantial likelihood of liability to the Company for their misconduct, including, among other things: (i) directly participating in the improper schemes and misconduct described herein; (ii) affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings and other public disclosures relating to the Company's business and operations, internal controls, legal proceedings, legal compliance, and

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 4

risks (including financial, operational, legal, regulatory, and enforcement risks); (iii) failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or correct violations of the law and improper statements made on the Company's behalf; (iv) failing to ensure the Company's compliance with relevant legal and regulatory requirements, including, but not limited to, requirements imposed under biometric privacy laws and antitrust laws, as well as state and federal securities laws; and (v) ignoring red flags indicating inadequate internal controls over compliance with biometric privacy laws and antitrust laws, as well as state and federal securities laws, and indicating violations the same.

9.     Due to the Amazon Board of Directors' (the "Board") knowledge of illegal conduct and involvement in the wrongdoing, its blatant failure to act (including to stop or correct violations of the law), its members' lack of independence, and the substantial likelihood of liability its members face, any demand upon the Board to rectify this wrongdoing would be a wasteful, useless, and futile act.  Accordingly, Plaintiff properly brings this action to remedy the harm to Amazon caused by Defendants' faithless actions and inaction.

## II.    JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has jurisdiction over each named Defendant.

12.     Additionally, this Court has specific jurisdiction over each named Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 5

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because: (i) Amazon maintains executive offices in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Amazon occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

### A.     Plaintiff

14.     Plaintiff was an Amazon stockholder at the time of wrongdoing complained of, has continuously been a stockholder since that time, and is a current Amazon stockholder.

15.     Plaintiff is a citizen of the State of Pennsylvania.

### B.     Nominal Defendant

16.     Nominal Defendant Amazon is a publicly traded Delaware corporation with its principal executive offices located at 410 Terry Avenue North, Seattle, Washington.

17.     The Company's common stock trades on the NASDAQ under the ticker symbol "AMZN."  Amazon has over 508 million shares of common stock outstanding.

### C.     Defendants

18.     Defendant Jeffrey P. Bezos ("Bezos") is the founder and Executive Chair of Amazon's Board of Directors.  Throughout the relevant period, Amazon has paid Defendant Bezos the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 6

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

| | | | | |
|---|---|---|---|---|
| 2021 | $81,840 | - | $1,600,000 | $1,681,840 |
| 2020 | $81,840 | - | $1,600,000 | $1,681,840 |
| 2019 | $81,840 | - | $1,600,000 | $1,681,840 |
| 2018 | $81,840 | - | $1,600,000 | $1,681,840 |

19.     Upon information and belief, Defendant Bezos is a citizen of the State of Washington.

20.     Defendant Andrew R. Jassy ("Jassy") is the President and Chief Executive Officer of Amazon and also serves on its Board of Directors.  He founded Amazon Web Services and served as CEO of from April 2016 to July 2021.

21.     Throughout the relevant period, Amazon has paid Defendant Jassy the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2021 | $175,000 | $211,933,520 | $592,649 | $212,701,169 |
| 2020 | $175,000 | $35,639,068 | $34,381 | $35,848,449 |
| 2019 | $175,000 | - | $173,809 | $348,809 |
| 2018 | $175,000 | $19,466,434 | $91,232 | $9,732,666 |

22.     Upon information and belief, Defendant Jassy is a citizen of the State of Washington.

23.     Defendant Brian T. Olsavsky ("Olsavsky") is the Senior Vice President and Chief Financial Officer of Amazon.  Throughout the relevant period, Amazon has paid Defendant Olsavsky the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 7

| 2021 | $160,000 | - | $3,200 | $163,200 |
| 2020 | $160,000 | $17,010,985 | $3,200 | $17,174,185 |
| 2019 | $160,000 | - | $3,200 | $163,200 |
| 2018 | $160,000 | $6,770,149 | $3,200 | $6,933,349 |

24.     Upon information and belief, Defendant Olsavsky is a citizen of the State of Washington.

25.     Defendant David H. Clark ("Clark") is the Chief Executive Officer of Worldwide Consumer.  On June 3, 2022, Clark abruptly announced his resignation from Amazon, effective July 1, 2022.  Throughout the relevant period, Amazon has paid Defendant Clark the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $175,000 | $55,589,120 | $310,451 | $56,074,571 |
| 2020 | $160,000 | $46,121,888 | $6,783 | $46,288,671 |

26.     Upon information and belief, Defendant Clark is a citizen of the State of Texas.

27.     Defendant Shelley L. Reynolds ("Reynolds") is Amazon's Vice President, Worldwide Controller and Principal Accounting Officer.  Upon information and belief, Defendant Reynolds is a citizen of the State of Washington.

28.     Defendant Adam N. Selipsky ("Selipsky") is the Chief Executive Officer of Amazon Web Services.  Throughout the relevant period, Amazon has paid Defendant Selipsky the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $109,722 | $81,294,756 | $49,045 | $81,453,523 |

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

29. Upon information and belief, Defendant Selipsky is a citizen of the State of Washington.

30. Defendant David Zapolsky ("Zapolsky") is Amazon's Vice President, General Counsel and Secretary.  Throughout the relevant period, Amazon has paid Defendant Zapolsky the following compensation:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2021 | $160,000 | - | $3,200 | $163,200 |
| 2020 | $160,000 | $17,010,985 | $3,200 | $17,174,185 |

31. Upon information and belief, Defendant Zapolsky is a citizen of the State of Washington.

32. Defendant Keith B. Alexander ("Alexander") has served a director of the Company since September 2020.  In addition, he also serves as a member of the Audit Committee.  Amazon compensated Defendant Alexander at least $934,297 in Stock Awards in 2020.  Upon information and belief, Defendant Alexander is a citizen of the State of Michigan.

33. Defendant Edith W. Cooper ("Cooper") has served as a director of the Company since September 2021.  In addition, she also serves as a member of the Leadership Development and Compensation Committee.  Amazon compensated Defendant Cooper at least $958,171 in Stock Awards in 2021.  Upon information and belief, Defendant Cooper is a citizen of the State of Connecticut.

34. Defendant Jamie S. Gorelick ("Gorelick") has served as a director of the Company since February 2012.  In addition, she also serves as Chair of the Nominating and Corporate Governance Committee.  Amazon compensated Defendant Gorelick at least $938,533 in Stock Awards in 2020 and $952,741 in Stock Awards in 2018.  Upon information and belief, Defendant Gorelick is a citizen of State of Maryland.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 9

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

35.     Defendant Daniel P. Huttenlocher ("Huttenlocher") has served as a director of the Company since September 2016.  In addition, he also serves as a member of the Leadership Development and Compensation Committee.  Amazon compensated Defendant Huttenlocher at least $951,489 in Stock Awards in 2019.  Upon information and belief, Defendant Huttenlocher is a citizen of the State of New York.

36.     Defendant Judith A. McGrath ("McGrath") has served as a director of the Company since July 2014.   In addition, she also serves as Chair of the Leadership Development and Compensation Committee.  Amazon compensated Defendant McGrath at least $934,297 in Stock Awards in 2020.  Upon information and belief, Defendant McGrath is a citizen of the State of California.

37.     Defendant Indra K. Nooyi ("Nooyi") has served as a director of the Company since February 2019.   In addition, she also serves as Chair of the Audit Committee.   Amazon compensated Defendant Nooyi at least $901,729 in Stock Awards in 2019.  Upon information and belief, Defendant Nooyi is a citizen of the State of Connecticut.

38.     Defendant Jonathan J. Rubinstein ("Rubinstein") has served as a director of the Company since December 2010.  In addition, he also serves as Lead Director and as a member of the Nominating and Corporate Governance Committee.   Amazon compensated Defendant Rubinstein at least $951,489 in Stock Awards in 2019.  Upon information and belief, Defendant Rubinstein is a citizen of the State of California.

39.     Defendant Patricia Q. Stonesifer ("Stonesifer") has served as a director of the Company since February 1997.  In addition, she also serves as a member of the Nominating and Corporate Governance Committee.  Amazon compensated Defendant Stonesifer at least $951,489 in Stock Awards in 2019.  Upon information and belief, Defendant Stonesifer is a citizen of the District of Columbia.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 10

40.     Defendant Wendell P. Weeks ("Weeks") has served as a director of the Company since February 2016.  In addition, he also serves as a member of the Audit Committee.  Amazon compensated Defendant Weeks at least $929,992 in Stock Awards in 2019 and at least $999,026 in Stock Awards in 2021.  Upon information and belief, Defendant Weeks is a citizen of the State of New York.

41.     Defendant Tom A. Alberg ("Alberg") served as a director of the Company from June 1996 until May 2019.  In addition, he also served as a member of the Audit Committee.  Upon information and belief, Defendant Alberg is a citizen of State of Washington.

42.     Defendant Rosalind Brewer ("Brewer") served as a director of the Company from February 2019 until February 16, 2021.  Amazon compensated Defendant Brewer at least $929,992 in Stock Awards in 2019.  Upon information and belief, Defendant Brewer is a citizen of the State of Washington.

43.     Defendant Thomas O. Ryder ("Ryder") served as a director of the Company from November 2002 until December 31, 2021.  In addition, he served as a member of the Leadership Development and Compensation Committee and as Chair of the Audit Committee. Amazon compensated Defendant Ryder at least $951,489 in Stock Awards in 2019.  Upon information and belief, Defendant Ryder is a citizen of the State of Washington.

44.     Defendant Nate Sutton ("Sutton") served as Amazon's Associate General Counsel at all relevant times.  Upon information and belief, Defendant Sutton is a citizen of the State of Washington.

45.     Collectively, Defendants Bezos, Jassy, Olsavsky, Clark, Reynolds, Selipsky, Sutton, and Zapolsky are referred to herein as the "Officer Defendants."

46.     Collectively, Defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, Weeks, Alberg, Brewer, and Ryder are referred to herein

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 11

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

as the "Director Defendants."

47. Collectively, Defendants Alexander, Nooyi, Weeks, Alberg, and Ryder are referred to herein as the "Audit Committee Defendants."

48. Collectively, Defendants Gorelick, Rubinstein, and Stonesifer are referred to herein as the "Nominating and Corporate Governance Committee Defendants."

49. Collectively, Defendants Cooper, Huttenlocher, McGrath, and Ryder are referred to herein as the "Leadership Development and Compensation Committee Defendants."

50. Collectively Defendants Bezos, Jassy, Olsavsky, Clark, Reynolds, Selipsky, Zapolsky, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, Weeks, Alberg, Brewer, Ryder, and Sutton are referred to herein as the "Individual Defendants."

51. Collectively Defendants Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and Weeks are referred to herein as the "Demand Board."

## IV.   THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### A.   Company Background: Amazon Is the Dominant Online Marketplace in the United States

52. Founded in 1994, Amazon is now one of the world's largest, most ubiquitous companies, as well as the world's largest retailer outside of China. It is the second largest private employer in the United States and provides products and services including online retail, smart home devices, cloud computing, and media streaming—including its own film and television content. Originally an online book retailer, Amazon quickly expanded into music and videos, and eventually electronics, toys, and other products prior to 2000. Presently, nearly any physical or digital product imaginable can be purchased on Amazon worldwide.

53. Amazon accounts for between 50-70% of total sales through online marketplaces. The marketplace shares of the next two largest online marketplaces—Walmart.com and eBay—

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 12

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

are in the single digits, by comparison. Millions of TPSs sell through Amazon's online marketplace, whereas for example, only 110,000 TPSs sell on Walmart.com. Amazon is the dominant online marketplace.

### B.  Biometrics and Facial Recognition Technology

54.  Further expanding on its retail business, Amazon launched its cloud-computing subsidiary, Amazon Web Services ("AWS"), in 2002. AWS provides a range of services to business and individuals including web hosting, storage, distributed computing, and analytics. Amazon is now the largest cloud computing service provider in the world. As part of the more than 200 services provided to its customers, AWS regularly receives, processes, and stores personal information of various individuals that provide this information to its customers.

55.  In 2014, Amazon began its foray into being an active presence in its customers' homes with its Alexa virtual assistant. Amazon's Alexa is now found on countless devices in millions of households, including on smartphones, televisions, speakers, as well as in Amazon's Echo products. As part of its services, Amazon's Alexa recognizes and stores details related to voice patterns and makes and stores recordings of its interactions with users. Biometrics is the technical term for measurements used to identify people's unique physical characteristics. Examples of biometric identifiers include an individual's DNA, fingerprints, irises or retinas, voiceprints, and facial geometry. The uniqueness and potential permanence of biometric identifiers present an advantage for businesses to accurately identify and distinguish individuals. Businesses presently use biometrics in a wide variety of applications, including data collection.

56.  One technological application of biometrics is facial recognition software. Facial recognition software uses biometrics to map facial features from a photograph or video. In particular, the software uses an algorithm that calculates a unique digital representation of the face based on the geometric relationship of a person's facial features (such as the distance between their

eyes, ears, and nose), creating a face signature or map.   The software then compares the information with a database of known faces to find a match.

57.   Facial recognition technology has been in use for many decades and is one of the most widely used biometrics.  Facial recognition technology uses the layout of facial features and their distance from one another for identification against a "gallery" of faces with similar characteristics.  These characteristics can be derived from either a still or video images.  Using statistics, facial recognition algorithms can measure the differences between the face being searched and the enrolled faces in a gallery.  The smaller the difference, the more likely those faces match.

58.   Facial recognition technology is primarily used for three different types of applications: first, facial recognition technology can anonymously characterize faces.  This allows for counting unique faces presented to the sensor over a period of time (sometimes called a "people counter").   Other functions include estimating the age, gender, ethnic origin, and even body mass index of each unique face thus encountered, usually for marketing purposes.   Second, facial recognition technology can verify a face against a known image.   For example, this would allow for confirmation that a face presented at a border checkpoint matches the digital face embedded in a document.  It also allows for access control, such as at the entrance of a building with a known and restricted population.  This function is typically called "verification." Third, facial recognition technology allows for identification of a face against a number of known faces within a database. For example, this allows for the technology to see if a criminal or terrorist in a surveillance video matches any mug shot photos of people previously arrested or convicted. This function is typically

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 14

1   called "identification."[3]

2   59.   Facial recognition technology has improved over the past decade.  Lower costs and

3   increased accuracy have allowed companies like Amazon to deploy increasingly sophisticated

4   facial recognition software in their applications—but it also has raised serious privacy concerns.

5   60.   Biometrics present significant potential privacy threats to the individual if they are

6   compromised, such as a heightened risk for identity theft.  While biometrics have been touted as a

7   way to improve security and potentially limit fraud, the use of biometrics raise grave concerns

8   about potential constant and surreptitious surveillance of individuals by the government and

9   private entities.  Additionally, if a person's biometric data is compromised, the harm could be

10  irreparable because this data would remain compromised.  While other types of theft, such as

11  compromising of bank accounts or credit card numbers, can be mitigated by obtaining new account

12  information, people cannot obtain new biometric data facial bone structure or DNA. Additionally,

13  significant privacy concerns surround the use of biometric data.   These concerns include

14  employers' ability to discover protected health information; ambiguous standards concerning

15  when biometric information can be shared, including with law enforcement; and multimodal big

16  data storage, in which multiple images and various types of biometrics are stored in a database for

17  widespread use.

18  61.   Due to the growing concern over the use of biometrics and facial recognition

19  technology, state laws, including in Illinois and Texas, prohibit commercial entities from capturing

20  an individual's biometric identifier without his or her consent.  Both states also require businesses

21  to protect biometrics using a reasonable standard of care that is the same as, or more protective

22

23  [3]   "Face   Biometrics."   IBIA,   https://www.ibia.org/biometrics-and-identity/biometric-
    technologies/face.  Accessed 1 Apr. 2022.

24

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 15

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

than, that used for other confidential or sensitive information.  They also prohibit selling or disclosing a biometric without consent, with certain exceptions, such as for law enforcement purposes.  In addition, at least 19 states restrict using, disclosing or sharing biometric data by either public or private entities, or require security measures, such as encrypting or properly destroying records with biometrics.  And at least 20 states have enacted legislation to protect the personal biometric information of students or minors.

### C.    The Illinois Biometric Information Privacy Act

62.    In 2008, the Illinois General Assembly enacted the Illinois BIPA to enhance the state's "limited State law regulating the collection, use, safeguarding, and storage of biometrics[.]" 740 Ill. Comp. Stat. § 14/5(e).  BIPA defines a "biometric identifier" as including a "scan of hand or face geometry." 740 Ill. Comp. Stat. § 14/10.  The legislature noted that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information," because while social security numbers can be changed if compromised, biometric data are "biologically unique to the individual," and "once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." 740 Ill. Comp. Stat. § 14/5(c).

63.    BIPA defines "biometric information" as:

a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry. Biometric identifiers do not include writing samples, written signatures, photographs, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color. Biometric identifiers do not include donated organs, tissues, or parts as defined in the Illinois Anatomical Gift Act or blood or serum stored on behalf of recipients or potential recipients of living or cadaveric transplants and obtained or stored by a federally designated organ procurement agency. Biometric identifiers do not include biological materials regulated under the Genetic Information Privacy Act. Biometric identifiers do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the federal

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 16

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

Health Insurance Portability and Accountability Act of 1996. Biometric identifiers do not include an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other image or film of the human anatomy used to diagnose, prognose, or treat an illness or other medical condition or to further validate scientific testing or screening.

740 ILCS 14/10.

64.     Under BIPA, a company may not collect or otherwise obtain a person or a customer's biometric identifier or biometric information without informing the subject in writing and securing a written release.  Nor may a company profit from an individual's biometric identifiers and information.  Moreover, companies must have a public, written policy establishing a retention schedule for biometric identifiers and information and guidelines for their permanent destruction. BIPA, §§ 14/15(a)–(e).

65.     BIPA provides for a private right of action.  For negligent violations of the Act, BIPA provides for liquidated damages of $1,000 or actual damages, whichever is greater for each violation; and in the case of intentional or reckless violations, statutory damages in the amounts of $5,000 or actual damages, whichever is greater for each violation.  BIPA also provides for reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses, and any other relief, including an injunction, as the state or federal court may deem appropriate.

### D.     Other State Laws Also Restrict Capture and Use of Biometric Data

66.     Since 2009, Texas has also had a biometric privacy act that prohibits the capture of an individual's biometric identifiers for a commercial purpose unless the individual is first informed and has consented to such data collection, the Capture or Use of Biometric Identifier Act ("CUBI").  The law also limits the sale or disclosure of an individual's biometric information except under limited circumstances.  In the law, "biometric identifier" means a retina or iris scan, fingerprint, voiceprint, or recording of hand or face geometry.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 17

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

67.     A violation of the Texas law is subject to a civil penalty of not more than $25,000 for each violation.  The attorney general may bring an action to recover the civil penalty.  Unlike BIPA, there is no statutory private right of action under the CBUI, but government enforcement for violation of the CBUI poses enforcement risks in the millions of dollars.  Therefore, there is substantial civil exposure for noncompliance.

68.     In 2017, the State of Washington became the third state to enact a targeted biometric privacy law, HB 1493.  Since then, the states of Arkansas, California, and New York have expanded cybersecurity data breach notification statutes to include protections for biometric data. The states of Delaware, Michigan, Massachusetts, Arizona, and Alaska currently have legislation pending concerning protecting biometric data.

69.     Underscoring the legal risks and magnitude of exposure, Facebook Inc. ("Facebook") recently reached a $650 million settlement for alleged violations of Illinois' BIPA for their use of facial recognition software without permission from affected users.  The Texas Attorney General has sued Facebook for alleged violations of the Texas Business and Commercial Code, which contains provisions governing the collection, retention and disclosure of biometric data.

70.     Given this legal and regulatory landscape, according to Defendant Bezos, serving as the Company CEO, "Privacy is the one aspect of Alexa that Amazon can't afford to screw up."

**E.     Amazon's Collection and Use of Biometric Data**

71.     Rekognition, which launched in November 2016, is Amazon's core facial recognition product.  Rekognition allows users to match new images of faces with existing, known facial images "based on their visual geometry, including the relationship between the eyes, nose, brow, mouth, and other facial features."  Rekognition is a cornerstone of many of Amazon's largest consumer products and services, including its photo platform, Amazon Photos, its smart home

systems and cameras, and its virtual assistant technology, Alexa.

72.     Amazon is also the largest provider of facial recognition technology to law enforcement agencies.  The Company has marketed its Rekognition software to agencies such as the U.S. Immigration and Customs Enforcement and the Federal Bureau of Investigation, to monitor individuals they consider "people of interest."  Amazon has also partnered with more than 1,300 law enforcement agencies, allowing them to use footage from their Ring home security cameras in criminal investigations.  Amazon has expanded these efforts marketing their facial recognition software to government agencies despite warnings from consumers, employees, members of Congress, and stockholders.

73.     In July 2018, the American Civil Liberties Union of Northern California ("ACLU") published the results of a study it conducted regarding Rekognition's accuracy.  According to the study, Rekognition incorrectly matched twenty-eight members of the U.S. Congress to people who had been arrested for a crime.  The false matches disproportionately involved people of color.  That summer, nearly seventy civil rights and research organizations wrote a letter to Bezos demanding that Amazon stop providing facial recognition technology to governments.  In their letter, they called the Company to "stand up for civil rights and civil liberties," stating "Rekognition is a powerful surveillance system readily available to violate rights and target communities of color." Amazon's own employees demanded the Company to stop selling its Rekognition facial recognition software to law enforcement, citing concerns over the "unique threat to civil rights and especially to the immigrants and people of color under attack by [President Donald J. Trump's] administration."

74.     To improve the accuracy of its facial recognition products and technologies, Amazon purportedly obtained a data set from IBM, referred to as the "Diversity in Faces Dataset" after IBM made it available to for-profit companies in early 2019.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 19          HERMAN JONES LLP
                                                                                    15113 Washington Ave. NE
                                                                                  Bainbridge Island, WA  98110
                                                                                              206.819.0821

75.     To access the Diversity in Faces Dataset, Amazon used the links provided by IBM to download or otherwise obtain from the Flickr Dataset each photograph in order to associate the biometric identifiers and information provided by IBM with the actual photographs to which the biometric data related.  Amazon's collection and use of the Diversity in Faces Dataset allowed it to profit from such data, including data of Illinois residents obtained and used without their consent, by allowing Amazon to improve the effectiveness of its own facial recognition technology and products.

76.     Additionally, Amazon Alexa and Echo devices are designed to record and respond to communications immediately after an individual says a wake word (usually "Alexa" or "Echo"). If the wake word is recognized, Alexa records the ensuing communication and then transmits the recording to Amazon's servers for interpretation and processing before receiving the relevant data in response.  Alexa also records surrounding voices and sounds once activated, including those not spoken by the user conversing with Alexa.  Amazon uses voice recognition technology to surreptitiously collect, use, and store voiceprints of its users to identify them, as well as using voice pattern data in conjunction with other customer data for its recognition capabilities.  Such recordings are retained as part of a user's account unless a user actively deletes them.  Alexa capability can be found on more than 100 million devices sold since January 2020.[4]  These include televisions, light bulbs, smart locks, phones, thermostats, appliances, speakers, and vehicles, in addition to Amazon's own line of Echo products.

77.     Finally, as part of Amazon's suite of services offered through AWS to its numerous commercial customers, AWS also stores various types of personal identifying information ("PII"),

---

[4] Rubin, Ben Fox. "Amazon's Alexa World Just Got Much Bigger." CNET, 6 Jan. 2020, https://www.cnet.com/home/smart-home/amazon-sees-alexa-devices-more-than-double-in-just-one-year/. Accessed 1 Apr. 2022.

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 20          HERMAN JONES LLP
                                                                                    15113 Washington Ave. NE
                                                                                    Bainbridge Island, WA  98110
                                                                                    206.819.0821

including biometric information, that is collected by those customers.  Such information can include, for example, fingerprints or hand scans of an AWS customer's employees for security and identification purposes.  Additionally, AWS stores PII of the individual customers of its commercial AWS customers, such as voiceprints used to identify callers to a call center or even the scanned facial geometry of players of video games.

78.     In and around September 2021, Amazon announced a series of new updates, focusing on the biometric capabilities of some of its hardware products, as well as on the company's AWS marketplace.[5]  By way of example, at its Enterprise Connect event on Monday September 27, 2021, the retail giant announced three new capabilities for Amazon Connect for contact centers.  According to the company's new data, tens of thousands of AWS customers are supporting more than 10 million contact center interactions a day on Amazon Connect.  The new platform updates employ voice biometrics via AWS's caller authentication tool Amazon Connect Voice ID.  The biometric solution reportedly provides real-time caller authentication and enables voice access via machine learning by analyzing the caller's speech attributes, like rhythm, pitch, and tone.  Another biometric update unveiled by Amazon at its product launch event related to the Echo Show 15, and its face biometrics capabilities.  The novel Visual ID biometrics feature enables Alexa devices to show users personalized recommendations, calendars, to-do lists, and more when their faces enter the camera's field of vision.

---

[5] Mascellino, Alessandro. "Amazon Unveils Series of Face and Voice Biometrics Updates." Biometric Update, BiometricUpdate.com, 30 Sept. 2021, https://www.biometricupdate.com/202109/amazon-unveils-series-of-face-and-voice-biometrics-updates. Accessed 1 Apr. 2022.

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 21

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

1

2

**F.    Amazon Employs Anti-Competitive Business Practices Designed to Maintain Its Dominance as Both an Online Marketplace and Retailer**

3      79.    As a multi-seller online marketplace, Amazon competes with other multi-seller

4    online marketplaces, like eBay, to sell hosting and other services to TPSs that want to sell their

5    products online to consumers.  Amazon also competes with both multi-seller and single-seller

6    online marketplaces (for example, a TPS's own website on which it sells its products online to

7    consumers) to attract consumer traffic to its marketplace and sales therefrom.

8      80.    Amazon competes not just as an online marketplace, but also with respect to

9    products that it sells directly to consumers through its online marketplace.  Thus, Amazon is both

10   the gatekeeper to its dominant online marketplace, and it is also a significant competitor for sales

11   of many products sold by the TPSs using Amazon's online marketplace.

12     81.    In its capacity as a retailer, Amazon sells goods that it buys from manufacturers and

13   wholesalers that Amazon refers to as First Party Sellers ("FPSs").

14     82.    Given the dominance of Amazon's online marketplace wherein it hosts millions of

15   TPSs, in order for many TPSs to successfully sell online, they must have a presence on Amazon.[6]

16     83.    Amazon's online marketplace dominance is protected by substantial barriers to

17

18

19   _____

[6] Online marketplaces are separate and distinct from brick-and-mortar or physical marketplaces.

20   The Federal Trace Commission and U.S. House of Representatives' Subcommittee on Antitrust, Commercial, and Administrative Law of the Committee on the Judiciary recognize this fact;

21   likewise, consumers do not consider online and physical markets to be substitutes for one another. Consumers using online marketplaces can shop for a virtually unlimited range of products without

22   limitation based on geographic area, time of day or day of the week, and can more easily compare competing offers on similar goods.  Sellers similarly recognize the superiority of online

23   marketplaces to physical ones for these same reasons, among others.  Thus, online and physical marketplaces are not close substitutes for one another.

24

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 22          HERMAN JONES LLP
                                                      15113 Washington Ave. NE
                                                      Bainbridge Island, WA  98110
                                                      206.819.0821

entry,[7] as well as its anti-competitive business practices.  These include Amazon's (i) former Price Parity Provision; (ii) current Fair Pricing Policy; and (iii) new Minimum Margin Agreement.

### a.   Price Parity Provision

84.    In order to sell their products through Amazon's online marketplace, TPSs execute Amazon's Business Solutions Agreement ("BSA").  Until at least 2019 in the United States, TPSs agreed through the BSA that they would not offer their products through other online marketplaces, including their *own* websites, at a lower price or on better terms than those TPSs offered through Amazon's marketplace (the "Price Parity Provision" or "PPP" of the BSA).  Specifically, through the PPP, TPSs agreed that the "purchase price and every other term of sale [would] be at least as favorable to Amazon Site users as the most favorable terms via Your Sales Channels."

85.    Through the PPP, Amazon insulated its dominance by forcing TPSs to charge the same prices on other online marketplaces, which reduced the ability of those other online marketplaces to gain consumer traffic and sales by offering TPSs lower fees and commissions so that the TPSs could in turn charge lower prices to consumers and still maintain their same profits on those marketplaces.  This provision artificially raised the price of goods to consumers across online marketplaces because TPSs were forced to incorporate Amazon's high fees and commissions into their product prices not only when selling through Amazon's marketplace, but also when selling through *any* competing online marketplaces.  These price restrictions resulted in

---

[7] For example, digital markets tend to be characterized by strong network effects, making them prone to monopolization, which are reinforced by Amazon's Prime program (which has enabled Amazon to build a massive customer base—126 million Prime members in the U.S. alone), the massive amounts of data Amazon collects regarding its buyers and sellers (*e.g.*, pricing and revenue data, customer reviews, and data regarding items viewed by customers), and Amazon's use of its delivery and logistics services to further solidify its online marketplace dominance— 85% of the top 10,000 TPSs use Amazon's FBA logistics and delivery services.

less competition and innovation, and higher prices and less choices for consumers.

86.     The PPP also protected Amazon from competition as a retailer in individual product markets.  Amazon and TPSs compete to sell certain products directly to consumers, and the PPP ensured that the high commissions and fees that Amazon charged to TPSs were incorporated in the price everywhere that the TPS offered its products online, thereby reducing the price competition on Amazon's own retail offerings that competed with a TPS's given product.

**b.      Fair Pricing Policy**

87.     In 2019, under scrutiny from Congress and U.S. government regulators, Amazon removed the PPP from the BSA, but it quickly replaced the PPP with a virtually identical provision, the Fair Pricing Policy ("FPP").

88.     Specifically, in December 2018, U.S. Senator Richard Blumenthal of Connecticut wrote the U.S. DOJ and the Federal Trade Commission to express his concerns about Amazon's use of the PPP, stating, in part, that "Amazon's price parity provisions may raise prices for consumers both in the short term and in the long run."  He concluded that regulators could "easily establish that Amazon has the high market share typically necessary to bring successful litigation under Section 2 [of the Sherman Act]."  Months later, in March 2019, Amazon removed the PPP from the BSA and replaced it with the FPP.

89.     Now, TPSs agree through the BSA to abide by Amazon's FPP, which permits Amazon to impose sanctions on a TPS that offers a product for a lower price or on better terms through a competing online marketplace.  These sanctions can include cancellation of listings, suspension or forfeiture of payments, and even banishment of the TPS from Amazon's online marketplace, which in many cases, would have devastating economic consequences for the TPS.

90.     Specifically, the FPP provides:

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 24          HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

Amazon regularly monitors the prices of items on our marketplaces, including shipping costs, and compares them with other prices available to our customers. If we see pricing practices on a marketplace offer that harms customer trust, Amazon can remove the Buy Box, remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminat[e] selling privileges.

Pricing practices that harm customer trust include, but are not limited to: . . . setting a price on a produce or service [on Amazon's platform] that is significantly higher than recent prices offered on or off Amazon.

91.    Amazon strictly enforces these policies using an extensive network of electronic surveillance and employees to monitor the prices of TPSs's products offered through other online marketplaces.  When Amazon discovers a TPS offering the same or similar products through a competitor online marketplace at a lower price, it sends the TPSs pricing alert warning the TPS that its product is no longer eligible for the "Buy Box," the featured offer on any product page. TPSs regularly receive these alerts.  Given the importance of the Buy Box feature, this punishment can be devastating for TPSs.

92.    Amazon also punishes TPSs for failing to comply with these policies by freezing TPSs' inventory, placing holds on accounts and payments from Amazon online marketplace sales, and suspending or revoking TPSs's accounts entirely.  TPSs regularly increase their prices on other online marketplaces in order to avoid Amazon's sanctions.

93.    Amazon further punishes a TPS if a different seller obtains and sells the TPS's products for less on a competing online marketplace, thereby further controlling pricing by incentivizing TPSs to monitor whether its products are being sold by other sellers for less than the price offered on Amazon.  This is the case even for products that are "similar," even though these purportedly similar products are often distinguishable in quality or function.

94.    These policies insulate Amazon from competition as a retailer as well.  Amazon directly competes with over half of its TPSs selling similar substitutable products to online

customers.  These fees, however, ensure that TPS products are offered at artificially high prices—not only on Amazon, but all other online marketplaces that compete with amazon, including the TPS's own website.  This, of course, reduces a TPS's ability to compete with Amazon's substitutable products.

### c.   Additional Fees Imposed on TPSs

95.     Subject to execution of the BSA and agreement to the PPP/FPP, a TPS may begin selling on Amazon, but to do so, it must pay Amazon certain fees and commissions.

96.     Specifically, TPSs can either fulfill their own orders or they can select "Fulfillment by Amazon," or FBA.  When a TPS sells FBA, Amazon charges additional fees to handle inventory, shipping, collection of payments, processing returns, and crediting the TPS's account.  Many TPSs pay Amazon a 40% sales commission by virtue of these and other fees.

97.     TPSs are forced to sell FBA and pay these fees because it is the primary means by which a TPS's products become eligible for the "Buy Box" and thus obtain profitable sales levels.  When Amazon and one or more TPSs offer the same or similar products on Amazon, Amazon combines all offers onto one product page with one product being awarded the "Featured Offer" or "Buy Box."  This product is the most visible to consumers on the product detail page and the is the easiest to purchase.

98.     The Buy Box is critical for TPSs.  82% of all TPSs' sales through Amazon occur through the Buy Box, and the percentage is higher for mobile purchases.  Many consumers will not even see a TPS's product unless it appears in the Buy Box, placing those TPSs without the Buy Box at a significant disadvantage.  The Buy Box does not signify the best product or the highest rated by consumers; rather, Amazon determines the winner for the Buy Box based on factors that reinforce Amazon's dominance in the online marketplace.

99.     According to a ProPublica investigation, roughly 75% of the time, Amazon

awarded the Buy Box to its own products and to companies that pay for its auxiliary online marketplace services even in cases where substantially more affordable product offerings from other TPSs were available.

100.    Competitor online marketplaces charge TPSs much lower fees and commissions. For example, Walmart.com's Fulfillment Services program charges a fixed monthly storage fee and fulfillment/delivery fees that are substantially less than Amazon's fees.  Likewise, eBay generally offers at least 50 free product listings before charging a $0.35 product listing fees, such that its fees, too, are generally well below Amazon's.

101.    These fees generate significant revenues for Amazon.  From 2014 to 2020, Amazon's revenue from TPS fees and charges ballooned from $11.75 billion to over $80 billion. Amazon's TPS service revenues were recently valued at more than $250 billion and now account for 21% of Amazon's total corporate revenue.  Notably, Amazon's profit margins on TPS fees are four times higher than its margins on its own retail sales.

### d.    Minimum Margin Agreement

102.    Amazon employs a different anti-competitive agreement with its FPSs to insulate itself from competition from other online marketplaces.  FPSs sell their products to Amazon for Amazon to sell, either as its own brand or otherwise, as a retailer through its online marketplace. In the sales agreements, FPSs and amazon agree that the FPS guarantees Amazon a certain minimum profit when Amazon sells the products its purchased from the FPS on Amazon's online marketplace ("Minimum Margin Agreement" or "MMA").

103.    If Amazon ultimately sells the product for a price that results in Amazon achieving less than the agreed minimum profit, the FPS must compensate Amazon for the difference.  This agreement can at times result in the FPS incurring millions of dollars in "true up" costs to Amazon. As a result, FPSs are incentivized to maintain higher prices on other online marketplaces to ensure

that Amazon does not drop its price based on lower prices elsewhere, thereby triggering the FPS's true-up requirements.  Indeed, FPSs have raised their prices to competing online marketplaces to prompt the maintenance of higher prices on those marketplaces and even asked those marketplaces to raise prices to online consumers to avoid triggering Amazon's MMA provision.  These agreements reduce other online marketplaces' ability to compete with Amazon by offering lower prices to consumers.  Thus, the MMA results in reduced competition among online marketplaces and higher prices to consumers.

104.    Amazon's PPP, FPP, and MMA insulate Amazon from competition as both an online marketplace and a retailer.  These agreements also cause prices on Amazon's and other online marketplaces to be artificially inflated, enable Amazon to charger higher fees and commissions to TPSs, reduce profits to TPSs and FPSs, and suppress innovation and reduce investment in competitor online marketplaces.

### G.    The Individual Defendants Made or Allowed Materially False and Misleading Statements to the Investing Public

#### a.    Privacy Statements

105.    The Individual Defendants have known for years of the significant risks to the Company related to laws regarding privacy and disclosed such risks to investors.  And at least as early as 2019, the Individual Defendants knew that Amazon was actively engaged in activities that were potentially illegal in nature.

106.    For example, on January 31, 2020, Amazon filed an Annual Report for fiscal year 2019 on Form 10-K with the SEC, reporting the Company's financial and operating results (the "2019 10-K").[8]  In the 2019 10-K, Amazon disclosed that it was using facial recognition software

---

[8] The 2019 10-K was signed by Defendants Bezos, Olsavsky, Reynolds Alberg, Gorelick,

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

in its Rekognition database.  The Company disclosed that it knew that there were ambiguities or uncertainties in how existing laws should apply to facial recognition technology.  2019 10-K at p. 12.

107.    While Amazon's official position appears to cloud the possible illegality of its actions, multiple shareholders expressly commented in April and May of 2019 that these actions violated BIPA and potentially violated customers' and human rights.[9]  Specifically, shareholders promoting a proposal observed there is insufficient board oversight related to Rekognition:

> [We] are concerned that the Amazon board is not equipped to adequately identify and assess the risks posed by Rekognition. The directors overall lack expertise that would give them the background or tools to assess the human rights impacts of machine learning, artificial intelligence, and the primary technologies behind a product like Rekognition. One possible exception is director Daniel Huttenlocher, who holds a Ph.D in Computer Science from MIT and hails an interest in "emerging technologies." The board also lacks any governance committee tasked with overseeing these risks. This is another reason why sales should be stopped until an independent group of experts has the ability to assess the risks and advise the board on whether or how it could proceed with sales of Rekognition to governments.[10]

108.    Additionally, according to shareholders, Amazon's Board ignored shareholder concerns about the sale of biometrics and facial recognition software to law enforcement:

> On June 15th, 2018, the lead proponent of this resolution was also the lead signatory on an initial letter by 19 financial services firms holding Amazon stock, including wealth management companies and registered investment advisors, raising strong objections to the introduction of the Company's facial recognition technology. Not only did Amazon not reply to the initial communication, there was no

---

Huttenlocher, McGrath, Rubinstein, Ryder, Stonesifer, and Weeks.

[9] *See* Rule 14a-103 Notice of Exempt Solicitation, Shareholder Rebuttal to Amazon.com, Inc., at p. 7 (Form PX14A6G) (May 1, 2019); *see also* Rule 14a-103 Notice of Exempt Solicitation, Shareholder Rebuttal to Amazon.com, Inc., at p. 6 (Form PX14A6G) (April 25, 2019).

[10] *See* Rule 14a-103 Notice of Exempt Solicitation, Shareholder Rebuttal to Amazon.com, Inc., at p. 9 (Form PX14A6G) (May 1, 2019); *see also* Rule 14a-103 Notice of Exempt Solicitation, Shareholder Rebuttal to Amazon.com, Inc., at p. 9 (Form PX14A6G) (April 25, 2019).

acknowledgment of receipt of the communication. Such initial issues raised specifically included "substantial risks for our Company negatively impacting our Company's stock valuation and increasing financial risk for shareholders." The June 15th, 2018 letter also stated: "...*we have seen no evidence of our Board of Directors conducting fiduciary oversight on how Rekognition may or may not, should or should not, be deployed.* The recent experience and scrutiny of Facebook demonstrated the degree to which these new issues may undermine company value as the detrimental impacts on society become clear. While Rekognition may be intended to enhance some law enforcement activity, we are deeply concerned it may ultimately violate civil and human rights."[11]

109.    The SEC added that "a number of other [Amazon] products – Alexa, Ring, and [Wi-Fi systems called] Eero – will face a spillover effect if Amazon's status as a trusted company is breached…"[12]

110.    In Amazon's Annual Report for fiscal year 2020 filed on Form 10-K with the SEC on February 3, 2021 ("2020 10-K"), the Company again expressly disclosed its knowledge of laws and regulations covering "privacy, data protection, data security, network security, consumer protection" as well as a number of others.  2020 10-K at pp. 13, 59.[13]  These laws include biometric information regulation.

111.    Similar disclosures appear in Amazon's Annual Report for fiscal year 2021 filed on Form 10-K with the SEC on February 4, 2022 ("2021 10-K").  2021 10-K at pp. 13-14, 59.[14]

---

[11] Rule 14a-103 Notice of Exempt Solicitation, Shareholder Rebuttal to Amazon.com, Inc., at p. 4 (Form PX14A6G) (May 1, 2019).

[12] *See* Amazon.com, Inc., SEC Division of Corporation Finance Letter, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2019/johnharringtonetal032819-14a8.pdf, at p. 6 (March 28, 2019).

[13] The 2020 10-K is signed by Defendants Bezos, Olsavsky, Reynolds, Alexander, Brewer, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Ryder, Stonesifer, and Weeks.

[14] The 2021 10-K is signed by Defendants Jassy, Olsavsky, Reynolds, Bezos, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and Weeks.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 30

112.    The Company's Annual Reports additionally fail to properly report on and obscure the magnitude of the Company's exposure in the Consumer Class Actions and mislead investors as to the astronomical financial, operational, legal, regulatory and enforcement risks of violating BIPA and of the actions already pending against the Company.

113.    Despite detailing numerous other specific legal matters, including specific cases involving patents, labor issues and Fair Credit Reporting (and the financial and operational risks attendant to those matters), Amazon's 10Ks for 2019, 2020, and 2021 universally fail to apprise shareholders of the Consumer Class Actions, the mounting *per violation* statutory fines and the potentially devasting effects to the Company posed by its violations of BIPA and these pending class actions.

114.    Moreover, the Board's responses to shareholder concerns reveals a lack of safeguards, a failure to oversee legal compliance issues, conscious disregard of the law, and a conscious choice to turn a blind eye to Amazon's conduct and the Board's oversight responsibilities.  When dismissing various shareholder concerns about facial recognition software, the Board stated: "In internal accuracy tests of Amazon Rekognition's facial recognition features, [Amazon Web Services] evaluated photos from a publicly available dataset of 1 million face images and found zero false positive matches at a 99% confidence level…"[15]  The Board carelessly referenced this testing and use of "1 million face images" to promote and excuse its actions.  Rather than vindicate the actions of the Company and provide value to the Company, that conduct led to a class action lawsuit for violations of BIPA and exposed the Company to significant liability.  The aforementioned "publicly available dataset" with the biometric data of 1 million people contained the biometric data of Illinois residents without their consent.  In 2020, Illinois residents brought a

---

[15] *See* Schedule 14A - Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed on April 11, 2019, at pp. 20, 23.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 31

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

class action against Amazon for precisely the misconduct the Board reviewed and celebrated.  *See Stephen Vance et al. v. Amazon.com, Inc.*, No. 2:20-cv-01084 (W.D. Wash. July 14, 2020).  These statements were approved by the Board at the time, which included Defendants Bezos, Alberg, Brewer, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Ryder, Stonesifer, and Weeks.

115.    The Company unsuccessfully attempted to suppress and omit from its 2019 proxy statement filed on Schedule 14a with the SEC on April 11, 2019 ("2019 Proxy Statement") the shareholder concerns raised in two shareholder proposals referenced above.  The SEC found Amazon's "facial recognition software is a high visibility offering of an estimated $23 billion revenue segment of the Company, Amazon Web Services."[16]  AWS has since grown even more lucrative for the Company, with the Company reporting the segment had $62 billion in revenue and $18 billion in operating income in 2021.

116.    As with Amazon's 2019 Proxy Statement, the Board's statements in its 2020 proxy statement filed on Schedule 14a with the SEC on April 16, 2020 ("2020 Proxy Statement") dismiss shareholder concerns about the risks and privacy implications of Amazon's facial recognition software.  These statements were approved by the Board at the time, which included Defendants Bezos, Brewer, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Ryder, Stonesifer, and Weeks.

117.    Again, in Amazon's 2022 proxy statement filed on Schedule 14a with the SEC on April 14, 2022 ("2022 Proxy Statement"), the current Board dismissed continued shareholder concerns about risks the Company faces from its violations of consumer privacy.  The Board responded to shareholder concerns by attempting to reassure shareholders that: "Our Board has

---

[16]    *See* Amazon.com, Inc., SEC Division of Corporation Finance Letter, https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2019/johnharringtonetal032819-14a8.pdf, at p. 6 (March 28, 2019).

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 32

reviewed Amazon Rekognition, along with other programs, as part of numerous AWS business reviews." 2022 Proxy Statement at p. 86.  The Board thus disregarded the shareholder concerns that Amazon is exposed to financial, reputational, regulatory, legal, and human capital management risk due to its sales of Rekognition.

118.    Despite the Individual Defendants' understanding that the Company's actions violated BIPA and were illegal, the Individual Defendants permitted the Company to make false statements about its compliance with applicable laws and regulations.  Moreover, no action was taken to prevent the Company from violating BIPA and similar statute statutes in other states and improperly exposing the Company to the significant legal exposure it now faces.  Additionally, the Individual Defendants' actions also violate Amazon's internal corporate policies.

>           **b.     Amazon Becomes the Subject of a**
>                   **Multitude of Class Action Lawsuits for Its**
>                   **Non-Compliance with BIPA and Other State Privacy**
>                   **Statutes, Which Have Significantly Harmed the Company**

119.    In direct violation of Illinois' BIPA statute, Amazon stored and continues to store its employees, its users,' and its clients' users' biometric information without informing them of these practices and without securing the users' written consent.  Amazon also violates BIPA by failing to develop a written policy, available to the public, establishing a retention schedule and guidelines for users to permanently destroy biometric identifiers when the initial purpose for collection was satisfied.

120.    These violations have exposed Amazon to substantial harm resulting to date in at least fourteen separate class action lawsuits for violation of BIPA, a sample of which are set forth below.  In connection with these class action lawsuits, Amazon has already expended significant monetary resources and risks astronomical liability when the actions are resolved.

121.    On June 26, 2019, a state consumer class action lawsuit was filed on behalf of

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 33

Amazon users in the Circuit Court of Cook County Illinois (the "Wilcosky Class Action").  The Wilcosky Class Action, which includes a subclass for individuals who do not have Alexa accounts ("bystanders") and a subclass for minors, asserted causes of action under section 14/15(b) and (a) of Chapter 740 of the Illinois Compiled Statutes.  Specifically, the plaintiffs asserted that Amazon's Alexa and Echo devices capture, collect and retain voiceprints of any and all people who speak near Alexa devices, regardless of age or affiliation with Amazon.  And in an effort to improve the voice and speech recognition technology, Amazon then retains every voice recording created by the user and any individual who happens to be speaking near the Alexa device. Plaintiffs there assert that Amazon never informed them, by written notice or otherwise, that Amazon collected, stored, and used their biometric identifiers and information, or of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and that Amazon does not publicly provide a retention schedule or guidelines for permanently destroying their biometric data.  Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation.  Amazon removed the action to federal district court for the Northern District of Illinois on July 26, 2019.

122.    On October 8, 2019, a putative Class Action Complaint was filed alleging that AWS unlawfully obtained and stored class members' biometrics information and identifiers in violation of BIPA (the "Hryniewicki Class Action").  The Hryniewicki Class Action asserted causes of action under section 14/15(a)–(b) of Chapter 740 of the Illinois Compiled Statutes.  Specifically, the plaintiffs asserted that Amazon offers cloud storage for businesses that handle biometric identifiers and biometric information and that BIPA regulates both the conduct of the entities that capture biometric data and companies that store data and information derived from those biometric identifiers.  AWS failed to implement a publicly available biometric data retention and destruction policy as required by Section 15(a) of BIPA.  They also assert that Amazon never informed them,

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 34

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

by written notice or otherwise, of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and used and never obtained written consent for the same, all in violation of Section 15(b) of BIPA. Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation. Amazon removed the action to federal district court for the Northern District of Illinois on November 15, 2019.

123. On November 15, 2019, a state consumer class action lawsuit was filed in the Circuit Court of Cook County, Chancery Division on behalf of plaintiffs whose biometric data is stored by Amazon (the "Ragsdale Class Action"). The Ragsdale Class Action asserted causes of action under section 14/15(a) and (b) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that as a leading cloud provider in the United States, AWS offers cloud storage services for businesses that handle biometric identifiers and biometric information, including employers that collect biometric information on their employees. Plaintiffs assert that despite possessing plaintiffs' biometric data, AWS failed to implement a publicly available biometric data retention and destruction policy as required by Section 15(a) of BIPA. They also assert that Amazon never informed them, by written notice or otherwise, of the specific purpose and length of term for which their biometric identifiers were being collected, stored, and used and never obtained written consent for the same, in violation of Section 15(b) of BIPA. On January 24, 2020, AWS removed the action to the federal District Court for the Northern District of Illinois, expressly pleading for purposes of removal that the amount in controversy exceeds the jurisdictional minimum of $5,000,000 and calculating damages as high as $10,000,000.

124. On October 16, 2020, a federal consumer class action lawsuit was filed against Amazon Web Services Inc. and Pindrop Security Inc. on behalf of Illinois citizens who used Amazon Connect and Pindrop's voice authentication and/or fraud detection technology during the specified class period (the "McGovern Class Action"). The McGovern Class Action asserted

causes of action under section 14/15(a)–(e) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that Amazon collected, captured, obtained, possessed and disseminated the biometric voice identifiers of plaintiffs for profit and without their consent in violation of BIPA. Plaintiffs further assert that Amazon failed to use reasonable standards of care in storing and protecting Plaintiffs' biometric information and biometric identifiers in violation of BIPA.  Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation.

125.    On September 28, 2020, a state employee class action lawsuit was filed on behalf of Amazon employees in the Circuit Court of Cook County, Illinois County Department, Chancery Division (the "Jerinic Class Action").  The Jerinic Class Action asserted causes of action against Amazon.com Inc. and Amazon.com LLC under section 14/15(a), (b) and (d) of Chapter 740 of the Illinois Compiled Statutes. Specifically, the plaintiffs asserted that, as employees, plaintiffs were required to have facial geometry scanned by a facial recognition camera and to have their temperatures taken before entering work and that this information is scanned, tracked, uploaded and stored in violation of BIPA.  Plaintiff employees seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation.  Amazon removed the action to federal district court for the Northern District of Illinois on October 30, 2020.

126.    On June 11, 2021, Plaintiffs Angela Hogan ("Hogan") and B.H., a minor, brought a putative class action against Amazon.com, Inc. (the "Hogan Class Action") in the Circuit County of Cook Illinois, which action was removed to the U.S. District Court for the Northern District of Illinois.  A First Amended Complaint was filed in federal court on July 21, 2021.  The Hogan Class Action asserted claims for violation of Section 15 (a)–(c) of BIPA and for unjust enrichment. Specifically, the plaintiffs asserted that the biometric identifiers—scans of facial geometry—of untold millions of people were obtained, stored, and analyzed by Amazon's Rekognition from the

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 36

billions of images uploaded to Amazon Photos daily in violation of BIPA.  Plaintiffs seek damages in the amount of $1,000 for negligent and $5,000 for intentional violation of BIPA, per violation.  On March 30, 2022, the court denied Amazon's Motion to Dismiss as to the BIPA claims.

127.    These and numerous additional class action lawsuits known to the Board for many years have placed the Company and the Board on notice of mounting and potential catastrophic harm to the Company and its shareholders.  Notably, BIPA provides that an aggrieved party can obtain damages on a "*per violation*"—not a "per person"—basis.  Thus, the potential damages recoverable against Amazon are astronomical to the point that Company could be put out of business if the violations are not immediately addressed, stopped, and remedied.

128.    On top of these Consumer Class Actions, Amazon has faced over 75,000 individual arbitration demands for privacy violations by devices deploying Alexa, forcing Amazon to foot the bill for tens of millions of dollars in case initiation fees due under its own arbitration policy, not to mention Amazon's own attorneys' fees as well as damages and attorneys' fees in any arbitration awards.[17]

129.    The expense and burden of these cases, as well as additional cases, on the Company is substantial.  In addition to direct harms from liability suits, the Individual Defendants' conduct also jeopardizes and harms one of Amazon's most important (and fragile) assets: consumer trust.  Reputational damage is particularly devastating for technology companies like Amazon.

### c.    Anticompetitive Business Practices Statements

130.    On February 1, 2019, Amazon filed an Annual Report on Form 10-K with the SEC,

---

[17] *See* Michael Corkery, *Amazon Ends Use of Arbitration for Customer Disputes*, N.Y. Times, (July   22,   2021),   https://www.nytimes.com/2021/07/22/business/amazon-arbitration-customer-disputes.html (reporting that each arbitration demand cost Amazon about $2,900 at the outset – which would equal $217 million for 75,000 arbitration demands).

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 37          HERMAN JONES LLP
                                                     15113 Washington Ave. NE
                                                     Bainbridge Island, WA  98110
                                                     206.819.0821

reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K").[18]  In the 2018 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business.  Rather, the 2018 10-K contained only a generic, highly general risk disclaimer to the effect that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things.  Amazon merely advised its investors that "[e]xisting and future laws and regulations may impede our growth" and failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

131.    In the 2018 10-K, Amazon reported net sales of $232.89 billion for the year.  Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that they were derived from impermissible anticompetitive conduct.

132.    Appended to the 2018 10-K as exhibits were signed Certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bezos and Olsavsky, attesting that "the [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

133.    On April 25, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call").  When asked to comment on Amazon's efforts to sustain its growth rate in the third-party marketplace business, Defendant Olsavsky responded, in relevant part:

---

[18] The 2018 10-K was signed by Defendants Bezos, Olsavsky, Reynolds, Alberg, Gorelick, Huttenlocher, McGrath, Rubinstein, Ryder, Stonesifer, and Weeks.

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 38

So again, let me reiterate our approach. So main goal here is that it will allow customers to have the broadest selection, the best available price and also the most convenient options on how they receive the item. If we're delivering on those three elements, we're indifferent as to whether it's sold by us or a third-party. We actively recruit sellers to sell on our platform, it's because it adds selection. It adds - if it's in the FBA program, it adds Prime eligible selection.

We spend billions of dollars a year, as Jeff said, on infrastructure, tools and services, not only to allow sellers to sell, but to help themselves more successfully. So we have a vested interest in the success of our sellers. Any growth acceleration or deceleration that you see can be very much tied to the total sales of the customer - that we have the customers in any country.

So you'll still see the percentage of third-party units increased and has been steadily over the last few years. So again, the sellers are as important to us as anything for servicing the customers' need for price selection and convenience.

134.    On or around June 3, 2019, the House Judiciary Committee initiated a bipartisan investigation into the state of competition online.  The Subcommittee's investigation examined the business practices and market dominance of Facebook, Google, Apple, and Amazon.

135.    In the course of the Subcommittee's investigation, the Subcommittee held several oversight hearings in which various officers of the above referenced companies, including their respective CEOs, offered witness testimony on topics such as the effect of market power on the press, innovation, and privacy, and the market dominance of the firms under investigation.  After each of the hearings, members of the Subcommittee submitted questions for the record to the witnesses.

136.    On July 16, 2019, Defendant Sutton testified before the House Judiciary Committee alongside executives from Google, Facebook, and Apple (the "July 16, 2019 Hearing").  When asked by Representative Pramila Jayapal whether Amazon "track[s] [the data] and create[s] products that directly compete with those most popular brands that are out there," Defendant Sutton responded, in relevant part, that "data on popularity of products like much retail data is

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 39

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

actually public data," but "[Amazon] do[es] not use any of that specific seller data in creating our own private brand products."

137.   At the same hearing, when asked by Subcommittee Chairman David N. Cicilline whether Amazon's algorithm for collecting data is used to support the sale of Amazon branded products, Defendant Sutton responded, in relevant part, "[o]ur algorithms, such as the buy box, is [*sic*] aimed to predict what customers want to buy [. . .] [a]nd we apply the same criteria whether you're a third-party seller or Amazon to that because we want customers to make the right purchase regardless of whether it's a seller or Amazon."

138.   As the Subcommittee Investigation proceeded, various reputable media outlets published reports that seemingly contradicted the testimony offered by Amazon's witnesses at the Subcommittee hearings.  For example, on July 18, 2019, the investigative news organization *Capitol Forum* published an article entitled, "Amazon: Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data."[19]  The former Amazon employee stated that Amazon "routinely tracked the popularity of independent sellers' products sold through its website," and that "[the former employee] used to pull sellers' data to look at what the best products were [. . . .]"  Accordingly, *Capitol Forum's* reporting appeared to directly contradict Defendant Sutton's testimony.

139.   On July 23, 2019, in response to the publication of the *Capitol Forum* article and similar reporting by other media outlets, Chairman Cicilline sent Amazon a letter requesting that the Company supplement Defendant Sutton's responses to questions at the July 16, 2019 Hearing because "[i]n several instances, Mr. Sutton responded to questions from [the Subcommittee] by

---

[19]  *Amazon: Former Employee Challenges Executive's Denial About Company's Use of Independent Sellers' Data*, The Capitol Forum (July 18, 2019).

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 40

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

offering other ancillary information or partial and selective responses."  Moreover, Chairman Cicilline's letter stated that "[i]n one instance, [Defendant Sutton's] answer has been contested by a former Amazon employee, raising questions about the veracity of his responses under oath."

140.    On July 25, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings Call").  When questioned whether there would be any change in Amazon's business to focus "more towards third-party from first-party," Defendant Olsavsky stated, in relevant part:

> On your comment, I assume you meant vendors not merchants, but on the move from 1P to 3P, but no there shouldn't be -- I can't highlight anything related shifting in channel there, but I would say that we remain in different on whether -- *we're focused on price convenience and selection for our customers. And whether product is a retail offering or third-party offering is not that important to us. As long as it's in stock, as long as it's priced competitively.*
>
> So, as you know our 3P selection has -- our 3P percent of units has been increasing over time and increased again in this quarter to 54% of units. *We continue to invest very heavily in our systems both for retail vendors and also for third-party merchants invest billions of dollars a year on behalf of then making Amazon a better place for customers to buy and increasingly not only vendor sales, but also third-party merchant sales.*

141.    On July 26, 2019, Defendant Zapolsky sent a letter[20] in response to Chairman Cicilline's July 23, 2019 letter, which stated, in relevant part:

> [. . .] while we prohibit in our private label strategy the use of data related specifically to individual sellers, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period. Use of aggregated store data about customers' shopping behavior is far from novel among retailers with a private label business. Many retailers, including large retailers with extensive private brand offerings and retailers with marketplaces,

---

[20]  Zapolsky, David. Letter to David N. Cicilline. July 26, 2019.   Retrieved from https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/07.26.19%20-%20amazon%20response.pdf.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

know the sales volume for products in their stores.[] Customers' shopping behavior in our store is just one of many inputs to Amazon's private label strategy. We also use other factors employed across the retail industry, such as fashion and shopping trends highlighted in the press and on social media, suggestions from our manufacturers for new or complementary product lines, and gaps in our product assortment relative to our competitors.

\*       \*       \*

[W]e use aggregated store data on total sales and search volume for categories and products (unless the product is only offered by a single seller, in which case we do not use that data).

\*       \*       \*

[T]he featured offer algorithm does not favor any particular type of offer, but rather seeks to determine which offer to highlight based on a prediction of which offer customers would choose if they were to compare all offers in detail. If our prediction is that the customer would likely prefer a product from a Marketplace seller over the offer from Amazon, then we feature the product from the Marketplace seller. We constantly refine our predictions to reflect customer preferences, and look to factors beyond price, including fulfillment speed, delivery speed, Prime eligibility, and seller performance.2 In the rare instances that our algorithmic weighting of these factors results in a tie in our prediction between an offer from Amazon retail and a product in Fulfillment by Amazon, we again endeavor to predict accurately customers' demonstrated preferences and feature the Amazon retail offer because our customers show a preference for products sold directly by Amazon.

Moreover, we make all offers easily available for all customers to shop. Customers may compare the closest competing offers and add them directly to their shopping cart via the "Other Sellers on Amazon" option [. . .], which is displayed on the product detail page directly below the featured offer. Customers may also browse all offers via the offer listing page, accessible via a hyperlink below the featured offer. There, customers may compare offers, sellers, shipping speeds, and prices. Our data also demonstrate that customers who compare the available offers overwhelmingly ultimately select the featured offer, further confirming that our criteria for selecting the featured offer accurately predict customer preference.

142.    On October 24, 2019, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q3 2019 results (the "Q3 2019 Earnings Call"). When asked to comment

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 42          HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

on the opportunities and competitiveness for third-party sellers, Defendant Olsavsky responded, in relevant part, "[o]n third party I would say we only succeed if the third party sellers succeeds. So we're heavily invested in them as they are in us.  So we are constantly investing on their behalf, adding new products and features and you know we are cognizant of their economics as well and we want a business that works for both of us and we set our fees accordingly."

143.    On January 31, 2020, Amazon filed the 2019 10-K.  In the 2019 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business.  Rather, the 2019 10-K contained only a generic, highly general risk disclaimer to the effect that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things.  Accordingly, Amazon failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

144.    In the 2019 10-K, Amazon reported net sales of $280.52 billion for the year. Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that they were derived from impermissible anticompetitive conduct.

145.    Appended to the 2019 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "the [2019 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

146.    On May 1, 2020, members of the Subcommittee sent Defendant Bezos a letter[21] in

---

[21]   Nadler,   Jerrold.   Letter   to   Jeff   Bezos.   May   1,   2020.   Retrieved   from https://judiciary.house.gov/uploadedfiles/2020-05-01_letter_to_amazon_ceo_bezos.pdf?utm_campaign=2719-519.

response to an April 23, 2020 *Wall Street Journal* article which alleged that Amazon employees used sensitive business information from TPSs on its platform to develop competing products. The letter stated that "[i]f these allegations are true, then Amazon exploited its role as the largest online marketplace in the U.S. to appropriate the sensitive commercial data of individual marketplace sellers and then used that data to compete directly with those sellers," and encouraged Defendant Bezos to testify before the Subcommittee.

147.   On May 15, 2020, Amazon sent a letter in response to the Subcommittee's May 1, 2020 letter to Defendant Bezos, stating, in relevant part:

> Because Amazon is privileged to have third-party sellers who now account for the great majority of sales of physical goods in Amazon's store, we determined years ago to take additional steps to give sellers comfort regarding their individual data. It was purely for that reason that we went beyond any legal requirement—and beyond the protections in place at any other store we are aware of—to begin to implement internal policies to restrict the use of non-public data specific to one particular selling partner to compete directly with sellers. We did this because we thought it was the right thing to do for our selling partners, who are also critical customers of Amazon—we wanted to go the extra mile to protect the trust of third parties selling in our stores. This policy, known internally at Amazon as our Seller Data Protection Policy, prohibits the use of nonpublic, seller-specific data to compete against our selling partners. As with any other employee policy at Amazon, we take the policy seriously, we train extensively on it, leadership reinforces that training, we audit for compliance, we examine allegations of breaches of the policy, and we iterate and improve based on what we learn. We do all of this solely in order to promote and enhance third party sellers' trust in Amazon, trust that we know is essential to our business.
>
> *        *        *
>
> In particular, on the issue of our use of data, the Committee asked in July 2019 whether Amazon uses "any of the data (including aggregate data on specific product categories) it collects on Marketplace transactions to inform its private label strategy?" We responded clearly: "Yes, while we prohibit in our private label strategy the use of data related specifically to individual sellers, like other retailers we use aggregated store data (e.g., total sales) and customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period." [] In response to the Committee's written

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 44

questions for the record last fall, we elaborated that the policy prohibits "Amazon's private brand products business from using individual sellers' data to decide which products to launch" and that the business is prohibited from using such data "to make sourcing, pricing, or inventory decisions for its private brand products." [] Our testimony at the Subcommittee's July 16, 2019 hearing about our company policy reaffirmed our policy and is consistent with the written record. As even the former employee quoted in the Wall Street Journal made clear, our seller data protection policy is well known to our employees, and using individual seller data to aid the private label business would be a clear violation of that policy.

148.    On July 29, 2020, Defendant Bezos testified before the Subcommittee.[22]  During the hearing, when asked by Representative Jayapal whether Amazon "ever access[ed] and use[d] third-party seller data when making business decisions," Defendant Bezos responded, in relevant part, "I can't answer that question yes or no.  What I can tell you is we have a policy against using seller-specific data to aid our private label business, but I can't guarantee you that that policy has never been violated."

149.    On September 4, 2020, Amazon submitted responses to the Subcommittee's post-July 29, 2020 hearing requests.[23]  In response to a request from Chairman Cicilline regarding Amazon employees' access to TPS data, Amazon stated:

Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in *The Wall Street Journal* from *The Wall Street Journal*. The *Journal*'s reporting conflates product-pricing and top-seller data—both of which are publicly displayed in Amazon's store—with the

---

[22] *Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the Subcommittee on Antitrust, Com. & Admin. L. of the H. Comm. on the Judiciary*, 116th Cong. 11-12, 101-3, 109-11, 113-18, 122-25, 130-33, 138-40, 145-46, 148, 153, 160-61, 164-66 (2020) (testimony of Jeffrey P. Bezos, CEO, Amazon.com, Inc.), https:www.govinfo.gov/content/pkg/CHRG-116hhrg41317/pdf/CHRG-116hhrg41317.pdf.

[23] Questions for the Record for Amazon following the July 29, 2020, Hearing of the Subcommittee on Antitrust, Commercial, and Administrative Law, Committee on the Judiciary. September 4, 2020.  https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-20200729-QFR052.pdf

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 45

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

individual seller data protected by Amazon's Seller Data Protection Policy. Amazon encourages employees to report any indication of potential lack of compliance with all internal policies, including the Seller Data Protection Policy, and Amazon responds appropriately to any such reports.

150.   On October 4, 2020, Amazon sent a letter to the Subcommittee "to follow up to questions related to Amazon's Seller Data Protection Policy and related internal investigation raised during the Antitrust Subcommittee's recent hearing and in response to the October 3 email from Subcommittee staff."[24]  The October 4, 2020 letter stated, in relevant part:

Amazon's investigation into the *Wall Street Journal*'s allegations that Amazon employees violated the Seller Data Protection Policy is complete, and we are satisfied that the results confirm, as with all our policies, the seriousness with which we take this policy.

*       *       *

There is some confusion on Amazon's use of its own store data. Amazon's data about the costs of selling in its own stores—data like the cost to shelve, handle, and promote a product that all stores have and use to manage their business—does not become secret when it relates to a product sold by a third party in Amazon's store. Amazon stills needs to process and use this information, like all retailers, to operate its store and better serve customers. In determining whether to launch a new product, including its own private-label products, Amazon takes into account factors such as the costs to shelve, handle, and promote that product. And, like any other retailer, it combines such store data with its own procurement and other costs to determine whether it believes sales of that product will be profitable. But that store data is the same irrespective of the seller. And, we do not receive information on costs incurred to procure or manufacture a product, or related profit data, from third-party sellers.

As an additional measure to protect the trust of our selling partners, Amazon's policy does not permit private brands employees to look at the number of sales made by a single seller. The policy does generally permit employees to look at aggregate sales data for products sold in the Amazon store—that is, data on the number of sales of a product in the Amazon store where there is more than one

---

[24] Huseman, Brian. Letter to Chairmen Nadler and Cicilline. October 4, 2020. Retrieved from https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__oct_04_20 20.pdf.

seller of that product. It is confusion on this point that seems to have animated this year's *Wall Street Journal* article,[] which appears to use the generic word "data" to mean both single-seller or aggregate data, resulting in the inaccurate implication that the use of any sort of Amazon sales data (even aggregate data) would violate the policy. Indeed, Amazon's records of past data queries related to the two products cited in the Wall Street Journal report show that a single former employee pulled and analyzed only aggregate data for both products in compliance with the Seller Data Protection Policy. And of course there is nothing novel about a retailer looking at its own store's aggregate sales data for a product in this way; retailers have used aggregate sales data for products sold in their stores for decades.

151.    On February 3, 2021, Amazon filed the 2020 10-K.  In the 2020 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business.  Rather, the 2020 10-K contained only a generic, highly general risk disclaimer to the effect that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things.  Accordingly, Amazon failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

152.    In the 2020 10-K, Amazon reported net sales of $386.06 billion for the year. Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that they were derived from impermissible anticompetitive conduct.

153.    Appended to the 2020 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Bezos and Olsavsky, attesting that "the [2020 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

154.    On October 18, 2021, members of the Subcommittee sent Amazon a letter in response to "recent, credible reporting that directly contradicts the sworn testimony and representations of Amazon's top executives—including former CEO Jeffrey Bezos—to the

Committee about their company's business practices during our investigation last Congress."[25] The letter stated that the Subcommittee was "providing [the Company] with a final opportunity to provide exculpatory evidence to corroborate the prior testimony and statements on behalf of Amazon to the Committee," and encouraged Amazon to "provide the Committee with sworn, truthful, and accurate responses to this request as we consider whether a referral of this matter to the Department of Justice for criminal investigation is appropriate."

155.    On November 1, 2021, Amazon sent a letter[26] in response to the Subcommittee's October 18, 2021 letter, stating that Amazon "ha[d] cooperated fully with the Committee's inquiries and engaged in good faith throughout this process, and the resulting record fully supports the transparency, candor, accuracy, and truthfulness of all of our statements, including on the topics raised in your letter," and that the Company "ha[d] in no way lied to or misled the Committee, and any allegation to the contrary is false and unsupported."   Further, Amazon's response letter stated, in relevant part:

> [Amazon's] statements to the Committee regarding this policy have been truthful and consistent throughout. At the July 16, 2019, hearing our witness stated that Amazon does not use individual seller data to compete with third party sellers, clarifying specifically that Amazon does not "use any of that specific seller data in creating our own private brand products" and that Amazon does "not use their individual data when we're making decisions to launch private brands."[] We confirmed that policy and further elaborated upon our witness's live testimony in our July 26, 2019, follow-up letter to the Committee, explaining that, "While we prohibit in our private label strategy the use of data related specifically to individual sellers, like other retailers we use aggregated store data (e.g., total sales) and

[25]    Nadler, Jerrold. Letter to Andy Jassy. October 18, 2021. https://judiciary.house.gov/uploadedfiles/letter_-_amazon_misrepresentations_-_10.18.21.pdf.

[26] Huseman, Brian. Letter to Chair Nadler, Chair Cicilline, Ranking Member Buck, Vice Chair Jayapal, and Representative Gaetz. November 1, 2021. https://judiciary.house.gov/uploadedfiles/letter_from_brian_huseman_to_committee__nov_01_2021.pdf.

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 48

customer shopping behavior (e.g., search volume) to identify categories and products with high customer demand over a given time period."[] And in our October 11, 2019, response to the Committee's subsequent written questions for the record, we again confirmed that "Amazon prohibits Amazon's private brand products business from using non-public individual sellers' data to decide which products to launch, and Amazon prohibits the use of non-public individual sellers' data to make sourcing, pricing, or inventory decisions for its private brand products."[] In response to Vice Chair Jayapal's question during the July 29, 2020, hearing referencing our witness's testimony of a year prior, Mr. Bezos testified, "What I can tell you is we have a policy against using seller-specific data to aid our private label business, but I can't guarantee you that that policy has never been violated."[] He also again clarified that using "aggregate data is allowed under our policies,"[] that "aggregate data" refers to more than one seller, and that Amazon's policy permits the use of aggregate data when there are many or only two or three sellers of a product.[] In written responses to questions for the record after that hearing, Amazon again explained the differences between aggregate versus seller-specific data in the Seller Data Protection Policy, elaborated on our entirely consistent prior testimony, and answered questions about Amazon's enforcement and auditing of its Seller Data Protection Policy.

156.    On February 3, 2022, Amazon hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call").  When asked to discuss why TPS services experienced less growth, Defendant Olsavsky responded, in relevant part:

On 3P, I think what you're seeing is a decreasing growth rate, much like the rest of the business, as I mentioned earlier, we're dealing with the very high growth period from Q3 of 2020 through Q1 of 2021. But on a two-year basis, you're still seeing 31% compounded annual growth in the 3P seller services revenue. Granted that was in the -- it was 34% last quarter, but it's maintaining. I think the bigger point is that sellers are definitely big winners in Q4. The percentage of units to 56% was a record for 3P. ***We continue to invest a lot to make sellers -- help sellers be successful on our site. They're a big consumer of advertising as well because they use it to build their brands and add -- enable customers to see their selection and make purchases. So we're very happy with the third-party seller services businesses, and again, looking for ways to help sellers be successful***.

157.    On February 4, 2022, Amazon filed the 2021 10-K.  In the 2021 10-K, Amazon failed to disclose that it was engaged in anticompetitive conduct with respect to its private-label business. Rather, the report contained only a generic, highly general risk disclaimer to the effect

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

that Amazon was "subject to general business regulations and laws, as well as regulations and laws specifically governing the Internet[] [and] e-commerce" and that these laws covered competition, among other things.  Accordingly, Amazon failed to disclose the specific and known risks arising from the Company's anticompetitive business practices.

158.    In the 2021 10-K, Amazon reported net sales of $469.82 billion for the year. Amazon failed to disclose, however, that these sales figures were unsustainable to the extent that they were derived from impermissible anticompetitive conduct.

159.    Appended to the 2021 10-K as exhibits were signed Certifications pursuant to SOX by Defendants Jassy and Olsavsky, attesting that "the [2021 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

160.    The statements referenced in this section were materially false and misleading because the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (i) Amazon engaged in anticompetitive conduct in its private-label business practices, including giving Amazon products preference over those of its competitors and using third-party sellers' non-public data to compete with them; (ii) the foregoing exposed Amazon to a heightened risk of regulatory scrutiny and/or enforcement actions; (iii) Amazon's revenues derived from its private-label business were in part the product of impermissible conduct and thus unsustainable; and (iv) as a result, the Individual Defendants' public statements throughout the relevant period were materially false and/or misleading.

          **d.    The Lies to Congress Regarding Amazon's
Anticompetitive Practices Are Exposed**

161.    On March 9, 2022, media outlets reported that members of the House Judiciary

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 50

Committee had requested that the DOJ open a criminal investigation into Amazon and certain of its executives for allegedly lying to Congress about its business practices.

162. As *Bloomberg* reported:

"Amazon repeatedly endeavored to thwart the Committee's efforts to uncover the truth about Amazon's business practices," a bipartisan group of lawmakers from the House Judiciary Committee wrote Wednesday in a letter to Attorney General Merrick Garland. "For this, it must be held accountable."

At issue is testimony given by Amazon during a 16-month congressional investigation into anticompetitive practices by tech giants. Amazon representatives, including then Chief Executive Officer Jeff Bezos, told Congress the company forbids employees from using data from third-party sellers to compete against them or craft rival products. But a series of media accounts suggested that Amazon employees have done just that, or at least found workarounds that render the policy useless.

This isn't the first time committee members have raised concerns about Amazon's testimony. Last October, the lawmakers asked Chief Executive Officer Andy Jassy to "correct the record" as they considered referring the matter to the Justice Department for criminal investigation.

Since then, the company has continued to deny it misuses seller data and refused to turn over business records, the lawmakers wrote. "As a result, we have no choice but to refer this matter to the Department of Justice," they wrote.

163. In response, an Amazon spokesperson asserted that there was "no factual basis" for the House Judiciary Committee's allegations.

164. Then, on April 6, 2022, *The Wall Street Journal* published an article entitled "SEC Is Investigating How Amazon Disclosed Business Practices." The article reported, in relevant part:

Federal securities regulators are investigating how Amazon.com Inc. has disclosed some details of its business practices, including how it uses third-party-seller data for its private-label business, according to people familiar with the matter.

The Securities and Exchange Commission is probing how the technology giant—the largest U.S. e-commerce retailer and cloud-computing company—handled

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

disclosures of its employees' use of data from sellers on its e-commerce platform, the people said. The SEC's enforcement division has asked for emails and communications from several senior Amazon executives, according to one of the people.

&ast;  &ast;  &ast;

As a result of its 16-month investigation into technology companies including Amazon beginning in 2019, the [House Judiciary Committee] proposed a series of bills aimed at reining in tech giants. One of the measures targets Amazon's private-label business, seeking to make it unlawful for the company to give its own products preference over those of competitors, or to use sellers' nonpublic data to compete with them.

&ast;  &ast;  &ast;

The SEC's probe has been under way for more than a year, one of the people familiar with the matter said

165.     On this news, Amazon's stock price fell $105.98 per share, or 3.2%, to close at $3,175.12 per share on April 6, 2022.

166.     As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Amazon's stock, the Company has suffered significant losses and damages.

## V.     THE INDIVIDUAL DEFENDANTS' DUTIES

### A.     Fiduciary Duties

167.     By reason of their positions as officers and/or directors of Amazon and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.  Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

168.     Because of their positions of control and authority as officers and/or directors of Amazon, Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful and illegal acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Amazon, each Defendant had knowledge of material, nonpublic information regarding the Company.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects including accurate information concerning financial, operational, legal regulatory and enforcement risks, so that the market price of the Company's stock would be based on truthful and accurate information.

169.     At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Amazon and was at all relevant times acting within the course and scope of such agency.

170.     To discharge their duties, Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Amazon.  By virtue of such duties, Defendants were, and are, required to, among other things:

(a)     Exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's certificate of incorporation and bylaws);

(b)     Neither violate nor knowingly permit any officer, director, or employee of Amazon to violate any applicable laws, rules, or regulations;

(c)     Remain informed as to the status of Amazon's operations, and upon receipt

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 53

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

or notice of information of illegal, imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and affairs of Amazon and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Amazon are conducted in accordance with all applicable laws, rules, and regulations; and

(f)     Truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.     Duties Pursuant to Amazon's Code of Business Conduct and Ethics**

171.    Amazon has in place a Code of Business Conduct and Ethics.  The very first principle it espouses states, "Employees must follow applicable laws, rules and regulations at all times.  Employees with questions about the applicability or interpretation of any law, rule or regulation, should contact the Legal Department."

172.    Amazon's Code of Business Conduct and Ethics also applies equally to its directors, stating "With respect to their service on behalf of the Company, Amazon.com's Board of Directors must comply with the relevant provisions of this Code of Conduct, including conflicts of interest, insider trading and compliance with all applicable laws, rules and regulations."

**C.     Additional Duties of the Audit Committee Defendants**

173.    In addition to the duties discussed above with respect to all of the Individual Defendants, the Audit Committee Defendants owed specific duties to Amazon under the Audit

Committee Charter ("Audit Charter").  Among other things, the Audit Charter charges the Audit

Committee Defendants with the following authority and responsibilities, among others:

> 1. *Annual and Quarterly Financial Reporting*: The Committee reviews and
> discusses with management and the independent auditors the annual audited and
> quarterly unaudited financial statements and related disclosures included in the
> Company's quarterly earnings releases and in the Company's periodic reports on
> Form 10-K and 10-Q.
>
> \*        \*        \*
>
> 3. *Disclosure, Accounting and Financial Controls*: The Committee discusses with
> management, the senior internal audit executive and the independent auditors the
> adequacy and effectiveness of the Company's disclosure controls and procedures,
> the adequacy and effectiveness of the Company's internal control over financial
> reporting, and the Company's risk assessment and risk management policies,
> including data privacy and security, business continuity, and operational risks.
>
> \*        \*        \*
>
> 10. *Legal, Regulatory, and Compliance*: The Committee oversees legal and
> regulatory matters that may have a material impact on the Company's financial
> statements and the Company's Code of Business Conduct and Ethics (other than
> with respect to workplace discrimination and harassment). The Committee
> periodically reviews the Company's compliance policies and procedures, and
> receives and reviews certain reports on complaints, allegations, and incidents
> reported pursuant to the Code of Business Conduct and Ethics or through the
> Company's other hotlines and procedures.

**D.     Additional Duties of the Nominating and Corporate Governance
Committee Defendants**

174.    In addition to the duties discussed above with respect to all of the Individual

Defendants, the Nominating and Corporate Governance Committee Defendants owed specific

duties to Amazon under the Nominating and Corporate Governance Committee Charter ("NCGC

Charter").   Among other things, the NCGC Charter charges the Nominating and Corporate

Governance Committee Defendants with the following authority and responsibilities, among

others:

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 55

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

11. The Committee oversees and monitors the Company's policies and initiatives relating to corporate social responsibility, including human rights and ethical business practices, and risks related to the Company's operations and engagement with customers, suppliers, and communities, other than with respect to human capital management matters, which are overseen by the Leadership Development and Compensation Committee, and compliance and controls matters, which are overseen by the Audit Committee.

12. The Committee oversees the Company's corporate governance initiatives and periodically considers, and reports to the Board on, corporate governance policies. In connection with this responsibility, the Committee develops and periodically reviews the Corporate Governance Guidelines and recommends changes to the Board.

175.   "Under its charter, the Nominating and Corporate Governance Committee, which is comprised of directors with experience in emerging technologies and public policy, is given responsibility for overseeing and monitoring the Company's policies and initiatives relating to corporate social responsibility, including human rights and ethical business practices, and risks related to the Company's operations and engagement with customers, suppliers, and communities."  2022 Proxy Statement, at p. 86.

176.   The Nominating and Corporate Governance Committee Defendants have allegedly provided oversight on behalf of the Board on aspects of Rekognition, including its facial recognition capabilities.  "These reviews focus on the actual operation and use of Amazon Rekognition, the potential concerns and abuses that critics have suggested could arise from the technology, and our actions to resolve or mitigate those risks and concerns."  *Id.*

### E.      Additional Duties of the Leadership Development and Compensation Committee Defendants

177.   In addition to the duties discussed above with respect to all of the Individual Defendants, the Leadership Development and Compensation Committee Defendants owed specific duties to Amazon under the Leadership Development and Compensation Committee

Charter ("LDCC Charter").   Among other things, the LDCC Charter charges the Leadership Development and Compensation Committee Defendants with the following authority and responsibilities, among others:

      (a)    Overseeing and monitoring the Company's strategies and policies related to human capital management within the Company's workforce, including with respect to policies on diversity and inclusion, workplace environment and safety, and corporate culture.

      (b)    The Committee establishes and reviews the compensation of the Company's Chief Executive Officer ("CEO") and all other executive officers, including establishing terms of employment for new executive officers; periodically reviewing and approving compensation for existing executive officers; reviewing and approving any compensation-related performance goals, including evaluating the satisfaction of such goals; and approving the terms associated with any executive officer's termination of employment.

## VI.   DAMAGES TO AMAZON

178.   As a direct and proximate result of the Individual Defendants' misconduct, actions, and failure to act, Amazon has suffered and continues to suffer significant harm, including, but not limited to:

      (a)    Legal and other costs incurred, and the distraction of, investigating and defending Amazon—including its subsidiaries, such as AWS—in the Consumer Class Actions, the Antitrust Actions, and the Securities Class Action, as well as potentially hundreds of millions of dollars in damages in connection with any settlements or judgments in connection therewith or

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 57

1    any other related litigation;

2    (b)    Legal and other costs incurred, and the distraction of, investigating and

3           defending Amazon in connection with the DOJ Criminal Investigation and

4           the SEC Probe, as well as the costs incurred in connection with any

5           penalties, fines, or other monetary impositions resulting therefrom;

6    (c)    Loss in market capitalization;

7    (d)    Legal and other costs incurred due to an increase in regulatory scrutiny of

8           Amazon's future products and services;

9    (e)    Costs incurred related to any corrective measures or changes to Amazon's

10          products or services in order to comply with laws or regulations applicable

11          to the misconduct;

12   (f)    The irreparable harm to the Company's reputation, loss of credibility, and

13          loss of goodwill associated with the Company's continued violations of law

14          and its failure to properly disclose the associated risks in its public

15          statements concerning its business, operations, and prospects;

16   (g)    Costs incurred from the unjust and unwarranted compensation and benefits

17          paid to the Individual Defendants and other members of Amazon's

18          management while they were engaged in the improper conduct alleged

19          herein; and

20   (h)    Mounting risk of catastrophic statutory damages on a *per violation* basis,

21          with millions of violations occurring daily each and every time biometric

22          data is captured and stored on Amazon devices, third party data is stored in

23          Amazon cloud-based services, and data is captured concerning Amazon

24          employees.

## VII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

179.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

180.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things: (i) deceive the investing public including stockholders of Amazon; and (ii) permit flawed and ineffectual internal controls over the Company's operations.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

181.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused and/or allowed the improper conduct described herein.

182.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

183.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the improper conduct described herein.  Because the Individual Defendants' actions occurred under the authority of the Board, each Individual Defendant was a direct, necessary, and substantial

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 59          HERMAN JONES LLP
                                                    15113 Washington Ave. NE
                                                    Bainbridge Island, WA  98110
                                                    206.819.0821

participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

184.     Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   DERIVATIVE ALLEGATIONS

185.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Amazon as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

186.     Amazon is named as the nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

187.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

188.     Due to the Board's direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, prosecution of this action independent of the Board is in the best interests of the Company and its stockholders.

## IX.   FUTILITY ALLEGATIONS

189.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

190.     Amazon's current Board, the "Demand Board," consists of eleven members, Bezos, Jassy, Alexander, Cooper, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and

Weeks.  Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile and useless act.

### A. Demand Is Excused as to Defendants Bezos and Jassy Because They Lack Independence

191.    Both Defendants Bezos and Jassy fall under the NASDAQ's definition of directors who are not independent.  According to the NASDAQ's rules regarding listing, a director is not independent if he or she is, or has been within the last three years, an employee or an executive officer of the listed company.  Because Defendant Jassy is Amazon's current President and CEO, he may not be considered independent.  Likewise, Defendant Bezos may not be considered independent as he served as its CEO from Amazon's founding up until July 2021.  The Company's 2022 Proxy Statement does not indicate that Defendants Bezos and Jassy are "independent" as defined by the NASDAQ rules.

192.    Furthermore, Defendant Jassy is not independent because his principal professional occupation is his employment with Amazon.

193.    As President and CEO of Amazon beginning in July 2021 and previously CEO of AWS since April 2016, Defendant Jassy received significant compensation from the Company as described herein.  Accordingly, Defendant Jassy lacks independence from the other members of the Board due to his interest in maintaining his executive positions.

194.    This lack of independence renders Defendants Bezos and Jassy incapable of impartially considering a demand to commence and vigorously prosecute this action.

### B. Demand Is Excused Because the Demand Board Faces a Substantial Likelihood of Liability for Their Misconduct

195.    Each member of the Demand Board breached their fiduciary duties by, among other things:

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 61

(a) Failing to ensure the Company's compliance with relevant legal and regulatory requirements;

(b) Failing to heed and take action upon red flags indicating violations of applicable laws and regulations across the Company and that the Company's internal controls to ensure compliance with applicable laws and regulations were inadequate;

(c) Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(d) Themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's operations, internal controls, legal proceedings and risks (including financial, operational, legal, regulatory and enforcement, risks); and

(e) Awarding Amazon's senior executives lavish compensation packages, despite their knowledge of and responsibility for the Company's willful misconduct.

196. Amazon's violations of BIPA are longstanding, have been raised before the Demand Board, and have been repeatedly disregarded by the Demand Board. In Amazon's 2019 and 2020 Proxy Statements, the Board even dismissed shareholder concerns specifically raising the illegality and privacy implications of Amazon's facial recognition system, Rekognition. A majority of the current members of the Demand Board – namely, Defendants Bezos, Gorelick, Huttenlocher, McGrath, Nooyi, Rubinstein, Stonesifer, and Weeks – were among the directors who dismissed shareholder concerns about BIPA and privacy violations.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 62

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

197.    In Amazon's 2022 Proxy Statement, the current Demand Board dismissed the risks posed to the Company by Amazon's flouting of consumer privacy rights under the law and responded to shareholder concerns by attempting to reassure shareholders that: "Our Board has reviewed Amazon Rekognition, along with other programs, as part of numerous AWS business reviews."[27]

198.    Each member of the Demand Board, by virtue of their positions as trusted fiduciaries of the Company charged with overseeing the Company's business and operations, knew of the Company's anticompetitive practices as well.  Amazon derives substantial revenues from its anticompetitive practices, and as such, the Demand Board would necessarily have to have been aware of these improper practices.  Moreover, the DOJ was well aware of the Company's anticompetitive practices by March 9, 2022, and media outlets reported that as of April 6, 2022, the SEC Probe was already well underway and had been for more than one year.

199.    Accordingly, the Demand Board faces a substantial likelihood of liability for their breaches of fiduciary duties, making any demand upon them futile.

200.    Additionally, the Audit Committee Defendants at all relevant times, had specifically defined duties to properly oversee: (i) the integrity of the Company's publicly reported financial statements, press releases, and guidance; (ii) its system of internal, financial, and administrative controls; and (iii) the Company's compliance with legal and regulatory requirements, including risk management policies and consumer privacy violation risks.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing and failing to correct the improper conduct detailed herein.

201.    For these reasons, the Audit Committee Defendants face a substantial likelihood of

---

[27] 2022 Proxy Statement, at p. 86.

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 63

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

1    liability for their breach of fiduciary duties, making any demand upon them futile.

2       202.    Additionally, the Nominating and Corporate Governance Defendants—who have

3    "experience in emerging technologies and public policy"—at all relevant times specifically

4    reviewed risks of Amazon's Rekognition facial recognition technology in operation and actions to

5    resolve or mitigate those risks, as part of their duty to oversee the Company's ethical business

6    practices.  Thus, the Nominating and Corporate Governance Defendants were responsible for

7    knowingly or recklessly allowing and failing to correct the improper conduct detailed herein.

8       203.    For these reasons, the Nominating and Corporate Governance Defendants face a

9    substantial likelihood of liability for their breaches of fiduciary duties, making any demand upon

10   them futile.

11      204.    The Demand Board is aware of Amazon's violations of law as detailed herein.

12   Fiduciaries of a Delaware Corporation cannot be loyal to a Delaware corporation by knowingly

13   causing it to seek profit by violating the law.  Each of the Directors face substantial likelihood of

14   personal liability for breaching their duty of loyalty, among many other duties.

15      205.    In the face of the knowing and continuing violations of law, each of the Directors

16   has failed to act, both to remedy illegal conduct and to apprise shareholders of the risks attendant

17   to Amazon's conduct, demonstrating a conscious disregard for their responsibilities and failing to

18   discharge their fiduciary duty of loyalty in good faith.

19      206.    Demand is futile as to each of the members of the Demand Board.

20   **C.    Demand Is Excused for Additional Reasons**

21      207.    Demand is futile because the Demand Board is dominated and controlled by

22   Defendant Bezos because of his immense influence as founder of the company and long tenure as

23   CEO.  Defendant Bezos built Amazon into one of the largest and most profitable companies in the

24   world and has about a 13% stake in the Company.

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 64        HERMAN JONES LLP
                                                   15113 Washington Ave. NE
                                                   Bainbridge Island, WA  98110
                                                   206.819.0821

208.    The Demand Board members are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants.  Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Amazon's name would necessarily expose the Board's own culpability for the very same conduct.  In other words, given that the Demand Board was required to be regularly informed concerning the Company's public reporting, outlook, controls, and employment decisions with respect to the Company's most senior officers, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Demand Board.

209.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by Amazon's officers and directors, and these acts are incapable of ratification.  Despite having knowledge of the claims and causes of action raised by Plaintiff, the Demand Board has failed and refused to seek to recover on behalf of the Company for any of the wrongdoing alleged by Plaintiff herein.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duties
### (Against the Director Defendants)

210.    Plaintiff incorporates by reference and realleges each of the preceding paragraphs above as if fully set forth herein.

211.    The Director Defendants owed and owe Amazon fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Amazon the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 65

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

with state and federal privacy laws, rules, and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

212.   The Director Defendants also owed and owe Amazon fiduciary duties under state corporation law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.

213.   In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Guidelines on Significant Corporate Governance Issues, Code of Business Conduct and Ethics, and the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

214.   Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

215.   The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)   Failing to ensure the Company's compliance with relevant legal and regulatory requirements;

(b)   Failing to heed and take action upon red flags indicating violations of law across the Company and that the Company's internal controls to ensure compliance with applicable laws and regulations were inadequate;

(c)   Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on

the Company's behalf;

(d)    Themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings and other public disclosures relating to the Company's operations, internal controls, legal proceedings and risks (including financial, operational, legal, regulatory and enforcement, risks);

(e)    Awarding Amazon's senior executives lavish compensation packages, despite their knowledge of and responsibility for the Company's willful misconduct; and

(f)    Reappointing the same directors who had failed in their duties to the Audit Committee and Nominating and Corporate Governance Committee.

216.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Amazon has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

217.    Plaintiff, on behalf of Amazon, has no adequate remedy at law.

### SECOND CAUSE OF ACTION

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

218.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

219.    The Officer Defendants owed fiduciary duties to Amazon and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 67

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

its Code of Business Conduct and Ethics, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

220.    The Officer Defendants violated these duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.  The Officer Defendants were well aware of the relevant privacy laws, rules, and regulations.

221.    The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements;

(b)    Engaging in a course of action which lead to violations of the law and regulations;

(c)    Themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings and other public disclosures relating to the Company's operations, internal controls, legal proceedings and risks (including financial, operational, legal, regulatory and enforcement, risks); and

(d)    Failing to implement and maintain adequate internal controls to ensure that adequate management and disclosure of risks.

222.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Amazon has sustained significant damages.  Accordingly, the Officer Defendants are liable to the Company.

223.    Plaintiff, on behalf of Amazon, has no adequate remedy at law.

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

### THIRD CAUSE OF ACTION

### Waste of Corporate Assets
### (Against the Individual Defendants)

224.    Plaintiff incorporates by reference and realleges each of the preceding paragraphs as if set forth fully herein.

225.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation and investigations detailed herein, in addition to any ensuing costs from a potential settlement or adverse judgment or any penalties, fines, or other monetary penalties imposed related thereto.

226.    Further, as a result of the failure to allow the Company to implement adequate internal and financial controls, the Individual Defendants have caused Amazon to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

227.    As a result of their waste of corporate assets, Defendants are liable to the Company.

228.    Plaintiff, on behalf of Amazon, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION

### Unjust Enrichment
### (Against the Individual Defendants)

229.    Plaintiff incorporates by reference and realleges each of the preceding paragraphs as if set forth fully herein.

230.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amazon.  The Individual Defendants were unjustly enriched because of the compensation and remuneration they received while breaching

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 69

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

fiduciary duties owed to the Company.

231.    Plaintiff, as a stockholder and representative of Amazon, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, severance payments, and other compensation obtained by the Individual Defendants, and each of them, in connection with, from or at the time of their wrongful conduct and fiduciary breaches.

232.    Plaintiff, on behalf of Amazon, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that a stockholder demand on the Amazon Demand Board would have been a futile and useless act;

B.    Finding that the Individual Defendants breached their fiduciary duties to the Company, wasted corporate assets, and were unjustly enriched;

C.    Finding against each Individual Defendant in favor of Amazon for the amount of damages sustained by Amazon, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.    Requiring the Individual Defendants to return to Amazon all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

E.    Directing Amazon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amazon and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 70

stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls and monitoring of compliance with anticompetition, antitrust, and privacy laws, including BIPA;

2.      a proposal to strengthen the Company's controls over accounting and financial reporting;

3.      a proposal to strengthen the Board's supervision of operations (including research & development along with third-party contracts) and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a proposal to strengthen Amazon's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

5.      a provision to permit the stockholders of Amazon to nominate at least three candidates for election to the Board;

6.      a proposal to appoint additional independent board members with established reputations in the IT/biometrics industry and with substantial experience in governance, risk, compliance, cybersecurity, and consumer privacy issues;

7.      a proposal to enhance and/or augment the audit, risk and compliance committees of the Board to oversee internal controls and compliance processes;

8.      a proposal to ensure that the Chief Compliance, Risk and Legal Officer(s) and other company leadership have (a) necessary subject matter and regulatory expertise; (b) direct reporting authority to the Board; and (c) adequate autonomy and resources to carry out their responsibilities;

9.      a proposal to review and implement revised codes of conduct, policies and procedures, training, integrity hotlines, auditing and monitoring processes and procedures;

10.     a proposal to review and implement policies and procedures for escalating

VERIFIED STOCKHOLDER DERIVATIVE COMPL. - 71

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

1    internal and regulatory issues internally and to the Board; and

2         11.    a proposal to review and implement the confidential reporting structure and

3    investigative process of complaints within the company;

4         G.    Directing Defendants to establish, maintain, and fully fund effective corporate

5    governance and compliance programs to ensure that Amazon's directors, officers, and employees

6    do not engage in wrongful or illegal practices;

7         H.    Granting additional appropriate equitable and/or injunctive relief to remedy the

8    Individual Defendants' misconduct, as permitted by law;

9         I.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

10    attorneys' and experts' fees and expenses; and

11         J.    Granting such other and further relief as this Court deems just and equitable.

12

13

14

15

16

17

18

19

20

21

22

23

24

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 72

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury as to all issues so triable.

3

Respectfully submitted, this 9th day of June, 2022.

4

*/s/ Gregory F. Wesner*

5

Gregory F. Wesner, WSBA No. 30241

6

HERMAN JONES LLP
15113 Washington Ave NE

7

Bainbridge Island, WA 98110
Tel.: (206) 819-0821

8

gwesner@hermanjones.com

9

Michael I. Fistel, Jr. (to seek admission pro hac vice)

10

JOHNSON FISTEL, LLP
40 Powder Springs Street

11

Marietta, GA 30064
Tel.: (470) 632-6000

12

Fax: (770) 200-3101
michaelf@johnsonfistel.com

13

Frank J. Johnson (to seek admission pro hac vice)

14

JOHNSON FISTEL, LLP

15

501 West Broadway, Suite 800
San Diego, CA 92101

16

Tel.: (619) 230-0063
Fax: (619) 255-1856

17

frankj@johnsonfistel.com

18

*Attorneys for Plaintiff*

19

20

21

22

23

24

VERIFIED STOCKHOLDERDERIVATIVE COMPL. - 73

HERMAN JONES LLP
15113 Washington Ave. NE
Bainbridge Island, WA  98110
206.819.0821

1

## <u>VERIFICATION</u>

2          I, Francis Gimbel Jr., hereby verify that I am familiar with the allegations in the

3   Verified Stockholder Derivative Complaint ("Complaint"), and that I have authorized the

4   filing of the Complaint and that the foregoing is true and correct to the best of my knowledge,

5   information, and belief.

6          Executed this <u>8</u> day of June, 2022.

7                                                        DocuSigned by:

                                                         *Francis Gimbel Jr*
8          _____
                                                         AC03BD722C23453
                                                         Francis Gimbel Jr.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24